# 𝔚𝔶𝔱𝔥𝔢𝔳𝔦𝔩𝔩𝔢.

JONES v. THE COMMONWEALTH.

GRAY v. THE COMMONWEALTH.

JUNE 18TH, 1885.

1. CRIMINAL PROCEEDINGS—*Negro*—*Colored Person*—*Definition.*—The term "negro" is identical in signification with the term "colored person," as defined by section 2, chapter 103, Code 1873; that is, "a person with one-fourth, or more, of negro blood." *Patterson's case,* 28 Gratt. 940.

2. IDEM.—*Felonious marriage*—*Indictment*—*Onus probandi.*—In order to sustain an indictment under section 8, chapter 7, Acts 1877–'78, making the intermarriage of a negro with a white person, a felony, it is necessary first to establish that the accused is a person with one-fourth, or more, of negro blood, *id est,* a negro ; and the burden of proving this, lies on the commonwealth.

Error to judgment of circuit court of Montgomery county, rendered 29th November, 1884, affirming a judgment of the county court of said county, rendered 3rd August, 1884, whereby the person, Isaac Jones, a negro, was sentenced to the penitentiary for two years and nine months, for felonious marriage with Martha Gray, a white woman.

Opinion states the case.

*George G. Junkin,* for the prisoners.

Appellant submits: That as he is not a full negro, but is a mulatto, he is not within the act of 1877–8; p. 302, section 8.

A negro is one who is of the full African race, just as a white person is of the pure Caucasian race. (Webster's dictionary.) The distinction between negroes and mulattoes was fully recognized as a social fact before the Code of 1819. There was no doubt as to what was a negro. The legislature defined a mulatto by statute (1 *R. C. p.* 423, *section* 11), and included all persons who had one-fourth, or more, of *negro blood.*

Code of 1819 recognized negroes and mulattoes as different classes of persons. 1 R. C. pp. 401, 422, 423, 424, 425, 426; (negro or other slave), 431, 432, 434, 437, 438, 440; 2 R. C. p. 43.

Code of 1847-8, page 111, when this crime was first introduced, carefully uses *both* terms. 1 Code 1849, chap. 103, sec. 3, introduced a rule of construction: "The word negro in this and any future statute shall be construed to mean mulatto, as well as negro," and accordingly, Code 1849, page 740, sect. 2, struck the word mulatto from the section prohibiting such marriage by a white person, and so the matter remained as to the meaning of "negro" until Acts 1865-6, page 84, when apparently to conform the definition to the colored persons, the marriage enabling act passed same day and found on the next page; the present statute as to definition of term "colored persons" was placed upon the statute book and the *statutory definition of mulatto and of negro repealed,* and the rule of construction of word negro was repealed.

It is submitted that all colored persons are not negroes—that the only law that ever existed including mulatto under the term negro has been repealed, and if the legislature has not fully remedied the effect of the repeal, still that is for them and not for the courts to do.

The repeal of a statute reinstates the common law rules. 16 Gratt. 1, 363, 519.

Then as the rule was introduced to prevent the necessity of the repetition of the word mulatto in order to make a statute against negroes apply to mulattoes, the repeal of that statute,

*reinstates the necessity to use the word mulatto* if a penal law is to apply to them, as they are of a different kind, class and race of people, especially as penal laws must be strictly construed. 1 Tucker's Comm. 16; 3 Munf. 507.

The commonwealth proved that Jones was a mulatto, but did not prove the *quantum* of negro blood in him, and therefore did not prove him even a colored person. Code, ch. 103, sec. 2.

*Attorney-General, F. S. Blair,* for the commonwealth.

The indictment in this case was against Isaac Jones, a negro man, for intermarrying with one Martha Arthur, *alias* Gray, a white woman. He was found guilty.

The demurrer was properly overruled—

1. Because the indictment, like lewd and lascivious cohabitation, etc., could have been either joint or several. *Scott* v. *Commonwealth,* 77 Va., p. 344, and cases therein cited.

2. Because the statute, sect. 8, page 302, Acts 1877-8, under which indictment was found, *was not contrary* to constitution of the United States, as claimed.

Marriage is a matter exclusively of state police, and state laws may regulate the whole subject. *Tinsley* v. *Virginia,* decided by supreme court of U. S. in 1882.

The indictment was, as stated, for the intermarriage of a negro man with a white woman, the plea was "not guilty," and on this issue the trial was conducted.

The instruction of the court was directly pertinent to the issue, and fully expounded the law, and there was no necessity for instructions of prisoner.

It is believed the word "negro," however, would legally embrace all "colored persons," under sect. 2, ch. 103, Code 1873, as contradistinguished to white persons.

But it is *not necessary* for the court to decide *this question,* in *this case,* as the jury, upon the most abundant proof, found that

Jones was a *negro* man, and had married Martha Arthur, *alias* Gray, a *white woman*.

The jury were judges of the credit of the witnesses, and they were satisfied that Jones was a *negro*, and his wife a *white woman*, and this is the whole case. An appellate court will not say, that, after taking the commonwealth's evidence (which alone can here be considered), the jury was not well warranted in their verdict.

LACY, J., delivered the opinion of the court.

The case is as follows:

In September, 1883, the plaintiffs in error were indicted in the county court of Montgomery county for intermarrying, the one being a negro and the other a white person.

The indictment against Isaac Jones is as follows: "That Isaac Jones, a negro, did, in the county aforesaid, on the          day of February, 1883, feloniously intermarry with one Martha Arthur, *alias* Martha A. Gray, a white person, against the peace and dignity of the commonwealth."

Upon the trial, the plaintiffs in error were convicted and sentenced to the penitentiary for two years and nine months, and two years, respectively.

From this judgment and sentence of the county court, the plaintiffs in error applied to the circuit court of the said county for a writ of error, which was allowed; and upon the hearing in the said circuit court, the judgment of the county court was affirmed. From which judgment a writ of error was allowed to this court, upon the petition of the said plaintiffs in error.

In this court it is assigned as error that the county court refused to set aside the verdict of the jury upon the motion of the plaintiffs in error, as contrary to the law and the evidence. The facts are certified by the county court; wherefrom it appears, that it was proved that Isaac Jones was a mulatto of brown skin, but that there was no evidence to show the *quan-*

*tum* of negro blood in his veins, and no evidence of his parentage, except that his mother was a yellow woman. That as to the *color* and *parentage* of Martha, the evidence was conflicting.

It appears from the certificate of the evidence in the bill of exceptions No. 1, excepting to instructions given in the case by the court, that there was evidence tending to prove that the woman had negro blood in her veins; that her mother had given birth to negro children before her birth; that she herself was a bastard, and was accustomed to associate and attend church with the negroes; and the colored pastor of the church testified that there were colored persons attending his church whiter than the said Martha.

Our statute provides, that "Any white person who shall intermarry with a negro, and any negro who shall intermarry with a white person, shall be confined in the penitentiary not less than two nor more than five years." Acts 1877–78, sec. 8, chap. 7, criminal code, approved March 14th, 1878, p. 302.

The indictment is drawn under the statute, and conforms thereto. The charge against Isaac Jones is, that he is a negro, and that being a negro he was married to a white woman. To be a negro is not a crime; to marry a white woman is not a crime; but to be a negro, and being a negro, to marry a white woman is a felony; therefore, it is essential to the crime that the accused shall be a negro—unless he is a negro he is guilty of no offence. It is necessary, then, to consider what is a negro under our law. Section 3 of chapter 103 of the Code of 1849, provided, that "Every person who has one-fourth part or more of negro blood shall be deemed a mulatto, and the word negro, in any other section of this or any future statute shall be construed to mean mulatto as well as negro."

Under that law, a negro was a person who had one-fourth or more negro blood in him; if the white blood predominated in any degree greater than three-fourths, the person was not a negro under the law and not a mulatto.

This law remained in force until February 27th, 1866, when the legislature substituted that law with the following:

"Every person having one-fourth or more of negro blood shall be deemed a colored person." Acts 1865–66, p. 84. And such is the present law in our Code. See ch. 103, sec. 2: "Every person having one-fourth or more of negro blood shall be deemed a colored person."

In 1865, as we have seen, the term colored person was substituted for the word negro, which had before that included the terms negro and mulatto.

But the statute of March 14th, 1878, amending the 8th section of chapter 192 of the Code 1873, which is the 8th section of the 196th chapter of the Code of 1849, enacted in 1847–8, using the word negro as did the original act of 1847–8, (see Acts 1847–8, p. 111,) and prescribing the same penalty for the negro which it provides for the white person. It does not use the term "colored person," but the word negro, and the plaintiff in error contends that this word can only mean a full-blooded African, and cannot include either the term mulatto or colored person, but must mean only a full-blooded African, since the statutory definition of negro, to which we have referred, has been repealed, and no definition of negro substituted, that the term negro by statute before 1865 included mulatto, but that statute being repealed, and there being no statutory definition of negro, it no longer by law includes mulatto. On the other hand, the attorney-general contends, that the term negro embraces all colored persons, as described and defined in section 2, of chapter 103 of the Code. If the contention of the plaintiff in error is correct, then the law has no application to any colored persons or mulattoes except the full-blooded African. Whereas, if the attorney-general is correct, the law applies to all persons who have as much as one-fourth negro blood in their veins, as provided in section 3, chapter 103, of the Code, *supra*.

At the March term of this court, 1877, this court construed

the said 2nd section of chapter 103, in a case which arose under the said 8th section of chapter 192 of the Code of 1873. In that case Judge Moncure, in an opinion in which the other judges concurred, said, "It thus appears that less than one-fourth of her blood is negro blood. If it be but one drop less, she is not a negro; besides having certainly derived at least three-fourths of her blood from the white race, she derived a portion of the residue from her great grandmother, who was a brown skin woman, and of course not a full-blooded African or negro, whose skin is black and never brown. If any part of the said residue of her blood, however small, was derived from any other source than the African or negro race, then Rowena McPherson cannot be a negro." See *McPherson's case*, 28 Gratt. p. 940. The term negro being held to be identical in signification with "colored person," as defined in section 2, chapter 103, of the Code, *supra*. See also Min. Inst. vol. 1, p. 242. It would then seem that to sustain an indictment under this statute, it is necessary to establish first, that the accused is a person with one fourth or more of negro blood, that is, that he is a negro; unless this is proved, the offence is not proved, because this is a necessary and essential element of the crime, without which there is no crime committed, as we have seen. From the certificate of facts in this case we find, that the accused was not a full-blooded negro, but had white blood in his veins, but there was no evidence to show the quantity of negro blood in his veins, and no evidence of his parentage except that his mother was a yellow woman. If his mother was a yellow woman with more than half of her blood derived from the white race, and his father a white man, he is not a negro. If he is a man of mixed blood he is not a negro, unless he has one-fourth at least of negro blood in his veins, and this must be proved by the commonwealth as an essential part of the crime, without which it cannot exist. The commonwealth, as we have seen in this case, has produced no evidence of this fact, and if every accused person is to be presumed to be innocent

until his guilt is proved, this person must be presumed not to be a negro until he is proved to be such. It follows that the judgment of the circuit court affirming the judgment of the county court, and the judgment of the county court complained of and appealed from here, must be reversed and annulled, and the case remanded to the said county court for a new trial to be had therein. And this applies with equal force to the case of Martha A. Gray, as to whom the same order will be entered.

HINTON, J., dissented.

JUDGMENT REVERSED.