CASE 58—ACTION FOR DAMAGES—OCTOBER 7.

# Ohio Valley Railway's Receiver v. Lander, Etc.

104   431
123   219

### APPEAL FROM CHRISTIAN CIRCUIT COURT.

1. RAILWAY COMPANIES—RIGHT TO SEPARATE WHITE AND COLORED PASSENGERS.—Railway companies have the right in the absence of special statute to prescribe regulations for the separation of white and colored passengers, giving equal accommodations to both.

2. CONSTITUTIONAL LAW—SEPARATE COACH LAW.—The provisions of the .Kentucky Statutes, sections 795-801, requiring the railway companies of the State to provide separate, equal coaches or compartments for white and colored passengers and to require the two classes to ride in the coaches or compartments respectively provided for them, do not violate the thirteenth or fourteenth amendment to the Federal Constitution.

3. SAME—INTERSTATE COMMERCE.—Whether such provisions violate the Federal Constitution on the subject of interstate commerce, a plaintiff whose journey is confined entirely to this State can not complain.

FAIRLEIGH & STRAUS AND HUNTER WOOD FOR APPELLANT.

1. A common carrier has a right to make reasonable regulations. for the separation of white and colored passengers. Com. v. Power, 7 Met. (Mass.), 596; 41 Am. Dec., 465; West Chester & Phila. R. R. Co. v. Miles, 55 Penn. St., 209; 93 Am. Dec., 744; Bass v. The Chicago N. W. Ry. Co., 36 Wis., 450; 17 Am. Rep., 495; Rebecca Smith, &c. v. D. H. Chamberlain, Receiver, &c., Law Rep. of date June 15, 1893, p. 710; 38 S. C., 555; 19 L. R. A., 710; Redfield on Railways (Ed. 1888), sec. 542 and notes; Wood's Railway Law, sec. 297; Angell on Carriers, 528, and Thompson on Carriers, 345; Chicago R. R. Co. v. Williams, 55 Ill., 185; Ches., &c., R. R. Co. v. Wells, 85 Tenn., 613; Memphis, &c., Ry. Co. v. Benson, 85 Tenn., 627; Louisville, &c., Ry. Co. v. State, 66 Miss., 662; Day v. Owen, 5 Mich, 520; Britton v. A. & C. Airline Ry. Co., 88 N. C., 536; Houck v. Ry. Co., 38 Fed. R., 226; McGuinn v. Forbes, 37 Fed. R., 639; The Sue, 22 Fed. Rep., 843; Murphy v. Ry. Co., 23 Fed. Rep., 318.   This power is further illustrated: Roberts v. Boston, 5 Cush, 198; Garnes v. McCann, 21 O. St.,

210; Lehew v. Brummell, 103 Mo., 546; 11 L. R. A., 822; Ward
v. Flood, 48 Cal., 36; 17 Am. Rep., 408; Bertonneau v. Directors
of City School, 3 Woods, 177; People v. Gallagher, 93 N. Y., 458;
45 Am. Rep., 252; Dawson v. Lee, 83 Ky., 49.

2. The separate coach law is constitutional. New Orleans, Tex., &c.
Ry. Co. v. State of Miss., 133 U. S., 587; Hall v. Decuir, 5 Otto,
485; State v. Gibson, 36 Ind., 389; 10 Am. Rep., 42; West Chester,
&c. Ry. Co. v. Miles, 55 Penn. St., 209; 93 Am. Dec., 744; People
v. Gallagher, 93 N. Y., 438; 45 Am. Rep., 232.

JOHN FELAND & SON FOR APPELLEE.

> Under the ·authority of a decision of the Supreme Court in
the case of Plessy v. Ferguson, the States have a right to pass
separate coach laws where they are made to apply solely to intra-
state commerce. But the act in question applied to all common
carriers whether foreign or domestic and to all passengers no
matter where they come from or where they are going. As
thus construed, the act is a violation of the interstate com-
merce clause of the Federal Constitution and void. Anderson
v. L. & N. R. R. Co., 62 Fed. Rep., 46; Baldwin v. Franks, 120
U. S., 685; U. S. v. Reese, 92 U. S., 214; Trade Mark Cases, 100
U. S., 82; Louisiana v. Allen, 103 U. S., 84; Income Tax Cases,
158 U. S., 635; Poindexter v. Greenhow, 114 U. S., 270; Sprague
v. Thompson, 118 U. S., 90; Hoke v. Com., 79 Ky., 561.

FELAND & SON FOR APPELLEE IN A PETITION FOR A REHEARING.

JUDGE GUFFY DELIVERED THE OPINION OF THE COURT.

This action was instituted by the plaintiffs, Robt. N.
Lander and Fannie E. Lander, his wife, against John Mc-
Leod, receiver of the Ohio Valley Railway. It is alleged
in the petition that the plaintiffs are husband and wife,
and citizens of Hopkinsville, Ky., and that they are col-
ored people, and citizens of the United States. It is fur-
ther alleged that said railway was in the possession and
under the control of said McLeod as receiver aforesaid;
and that said McLeod, through his agents, etc., has been
and is operating it as a common carrier, and said rail-
way extends from the city of Evansville, Ind., through

the cities of Henderson and Princeton to Hopkinsville, Ky., and is an interstate carrier of passengers and freight between said points, and is so operated by McLeod, receiver; and that on or about the 24th of July, 1895, the plaintiffs purchased from the agent of said McLeod a first-class passenger ticket for the female plaintiff, entitling her to ride on said railway and connecting line from Hopkinsville by way of Princeton to Mayfield, Ky., in any first-class coach of any passenger train running between said points; and with said ticket in her possession she boarded the regular passenger train of defendant, which was then about to leave said station, and entered what is usually called the ladies' coach, and took a seat therein, which was not at the time occupied or claimed by any other person, and while thus seated and waiting for the train to start the conductor thereof in charge of said train came to her, and without demanding of her her ticket or making any explanation of his conduct, required her to give up her seat and leave said coach, and occupy a seat in the front coach usually called the smoker, in a small compartment in front thereof, or get off of the train; that it was very warm weather, and the compartment to which she was thus assigned was small and illy ventilated, and that it was unclean and equipped and fitted with accommodations greatly inferior to the ladies' coach from which she was thus ordered by said conductor, and was occupied by colored passengers of all classes, sexes and conditions, and persons were allowed to smoke and indulge in other practices without restraint therein, offensive to ladies and children, and which was not permitted in said ladies' coach; that she refused to give up her said seat, and asserted her right as holder of a first-class ticket to remain

[28]

where she was; that said conductor went into another coach, or part of said train, and came back with two or three other men who were also agents of defendant, and upon her persisting in retaining her seat said conductor took hold of her by the arms and shoved her up from it, and was proceeding by force of arms to remove her from said coach, and plaintiff in order to avoid a physical struggle with said employes and prevent a breach of the peace, yielded, under protest, to the commands of said conductor, and consented to go into said car rather than give up her trip by being removed from the train, and she was thus compelled to occupy a seat in said car until said train reached said Princeton, the end of her journey on that road; that after she had gone into said compartment the conductor demanded of her her ticket, which she gave up to him; that plaintiff, Fannie E. Lander, is a lady of good character and reputation, and that she was not at the time interrupting, or in any way disturbing or interfering with anybody, and by this violent and illegal conduct of the conductor and other employes of the defendant, these plaintiffs have been damaged in the sum of $10,000, for which they prayed judgment.

The defendant filed a demurrer to said petition.

The answer of the defendant is as follows: The defendant for answer to the petition herein denies that while plaintiff, Fannie E. Lander, was seated in one of its passenger cars and waiting for the train to start the conductor in charge of this defendant's car came to her and, without demanding her ticket, or making any explanation to her of his conduct, required that she should give up her seat and leave said coach, or to occupy a seat in the front coach usually called the smoker, or in a small compartment in the front part thereof, or to get off of the

train. He denies that the compartment to which the plaintiff was invited to take a seat was small or illy ventilated, or that it was unclean or unfitted or equipped with accommodations greatly or at all inferior to those of the coach in which plaintiff was seated at the time she was requested to go into another coach, or that said compartment was occupied by persons who were unfit to be in said compartment, or to indulge in any practice or practices, without restraint therein, offensive to ladies and children, which were not permitted in the coach which plaintiff was invited to leave. He denies that, when plaintiff was requested to leave the coach that she was in, she refused to give up her said seat or to leave said coach, or that she asserted any right, as the holder of a first-class ticket, to remain where she was when said conductor requested her to leave said coach; and he denies that said conductor went into another coach or a part of the said train, or came back into the coach where plaintiff was with two or three other men, or any other men, who were agents or not agents of this defendant, and that, upon her persisting and retaining said seat, the said conductor took hold of her by the arms, or shoved her up from the seat, or was proceeding by force of arms to remove her from said coach, or that plaintiff in order to avoid a physical struggle with said conductor or persons, or to prevent a breach of the peace, yielded under protest to the commands of the said conductor, or consented under protest to go into said compartment in order to avoid being removed from said train, or to avoid giving up her said trip, or that she was thus compelled or forced to occupy a seat in said compartment until said train reached Princeton, the end of defendant's road. He denies that by reason of any illegal or violent con-

duct by the conductor in charge of said train, or any other employe upon said train, the plaintiff was greatly or at all damaged in the sum of $10,000, or any other sum.

The defendant, for further answer, says that the plaintiff bought a ticket at Hopkinsville, Ky., to Mayfield, Ky., and started to board one of defendant's trains at Hopkinsville, Ky.; and, when she made an effort to board said train, the brakeman in charge of said train, and under the employment of this defendant, was standing at the steps of the coach, where it was his duty to stand, and there informed the plaintiff before she got into any coach to go into the colored coach, the apartment set apart for colored people, as required by the laws of this State. The plaintiff refused to do this, and went to the white coach. The conductor thereupon went into the white coach, and politely informed the plaintiff of the law of this State providing for separate coaches for colored and white passengers, and politely requested her to obey the law, and to go into the compartment provided for colored people, and took the plaintiff's basket or baggage and carried it into the colored compartment for her, and requested her to go into said car. The plaintiff, without being forced in any way and without any force being used upon her in any way, consented to go into said coach, and did go into said coach. The conductor did not take hold of the plaintiff, and did not force her from her seat, by any violence whatever, but, after explaining to her about the law and the requirements of the law, the plaintiff voluntarily, in company with her husband, left the white coach, and went into the coach provided for the colored people. No insulting language was used by the conductor or any other employe of the train to the plaintiff, and she was not in any way mistreated or offended by any misconduct

upon the part of the conductor of said train, or any other employe connected with the operation of said train. The defendant further states that the compartment provided on said train for the colored passengers was in every way as comfortable, as clean, and as free from offensive misconduct on the part of the passengers as the coach provided for first-class white passengers. Said coach was well ventilated, and was as well provided and equipped in every respect for the comfort of colored passengers as the coach in which the plaintiff was at the time she was invited to go into the colored compartment. No smoking was allowed in said compartment, and no disorderly conduct or offensive or disorderly characters were permitted to ride in said coach, but the same was as well conducted in every respect and as well policed in every respect as the coach which plaintiff was invited to leave. The defendant says that these separate coaches are provided by virtue of a law passed by the Kentucky Legislature, and that he has obeyed said law, and requires all of his agents in the operation of his road to obey it, and it is the duty of every passenger, white or black, to obey it, and nothing was done on this occasion except to request the plaintiff to obey the law, which she did, and she was not compelled to do so by any violence used by the conductor or any other agent towards her. Having fully answered, defendant prays to be dismissed and for his costs herein expended.

The reply is a traverse of the affirmative matters of the answer, and the affirmative averments of the reply were, by agreement, controverted of record.

A jury trial resulted in a verdict and judgment in favor of plaintiffs for $125, and, appellant's motion for a new trial having been overruled, the prosecutes this appeal.

The grounds relied on for a new trial are: (1) Because the court erred in giving instruction No. 1, asked for by plaintiff; (2) because the court erred in refusing to give instructions Nos. 2, 3 and 4, asked by appellant; (3) because the verdict is contrary to the law and the evidence.

The instruction given by the court is as follows: "The court instructs the jury that, under the law and the evidence in this case, the plaintiff had the right to take a seat where she did in the ladies' coach, and that any attempt on the part of the defendant, his agents or employes in charge of the train, to make her move into or take a seat in another coach was a violation of law and of her rights; and, if she was required by any conductor or any agent or servant of the defendant so to remove, the jury must find for plaintiffs the damages they have sustained; and in so finding they are not confined to actual damages, but may take into consideration the humiliation and injury to the feelings of the plaintiff, and the nature and condition of the compartment which she was required to occupy, and find in any sum not exceeding the amount claimed in the petition."

The defendant asked the three following instructions, which were refused by the court:

"(1) If the jury believe from the evidence that the plaintiff got into the ladies' coach in defendant's car at Hopkinsville, Ky., and was invited, in a polite and courteous way, by the conductor of said car, to leave the same, and go into the compartment prepared for colored passengers; and they believe from the evidence, further, that said compartment prepared for colored passengers was substantially as comfortable in all of its appointments as the car from which she was invited to leave; and they further believe from the evidence that the conductor was

not guilty of any misconduct towards the plaintiff, and used no more force than was necessary to compel a compliance with his request—then the law is for the defendant, and the jury should so find.

"(2) The court instructs the jury that it was the duty of the defendant to provide separate coaches for colored and white passengers, and it was the duty of the defendant, through its agents, officers, or employes, to compel colored passengers and white passengers to occupy the respective compartments prepared for them and it was the duty of the plaintiff to obey this regulation of the company; and if the jury believe from the evidence that the defendant was in good faith at the time enforcing the regulation, and using no more force than was necessary to compel the plaintiff to conform to this regulation, then the law is for the defendant, and they should so find.

"(3) The court instructs the jury that, in the event they should find for plaintiff, they can only find compensatory damages; that is, such damages as would actually compensate her for any injury done to her, including any mental anguish or mortification to her feelings resulting by reason of the conduct of defendant's agents and employes in compelling her to leave the ladies' coach and go into the colored compartment."

It will be readily conceded that it was the duty of the appellant to furnish the appellee a seat in a coach as good and comfortable as the others used or set apart for the accommodation of first-class white passengers, and also that appellant would not be justifiable in using unnecessary force in requiring plaintiff to occupy the coach set apart for colored passengers; and, while there is some conflict in the proof in this respect, the chief, if not the sole, question discussed in the briefs on file is the con-

stitutionality or validity of an act of the Legislature of 1892, commonly called "The Separate Coach Bill." It is, however, suggested by appellant that, in the absence of any statutory enactment, the appellant company had the right to adopt and enforce rules and regulation requiring colored persons and white persons to occupy separate coaches.

The Supreme Court of North Carolina in Britton v. A. C. Airline Railway Co., 88 N. C. 542, used the following language: "Equally well settled does it seem to be, both upon principle and authority, that amongst those reasonable regulations which they have a right to adopt is the one of. classifying their passengers, and assigning them to separate, though not unequal, accommodations. This right, as regards the separation of the white and colored races in public places, has been expressly and fully recognized in many of the courts,. both State and National [quoting West Chester, &c., Railroad Co. v. Miles, 55 Pa. St. 205; Day v. Owen, 5 Mich. 520; Hall v. De Cuir, 95 U. S. Rep. 485]. In some of the cases it is said to be not barely a right appertaining to the carrier, but a positive duty, whenever its exercise may be necessary in order to prevent contacts or collisions arising from natural or well-known antipathies, such as are likely to lead to disturbances from promiscuous intermingling."

The Supreme Court of Illinois in Chicago & N. W. Railway Co. v. Williams, 55 Ill., 187, said: "It is the undoubted right of railroad companies to make all reasonable rules and regulations for the safety and comfort of passengers traveling on their line of road. It is not only their right, but their duty, to make such rules and regulations. It is alike the interest of the companies and the public that such rules should be established and enforced, and ample

authority is conferred by law on the agents and servants of the companies to enforce all reasonable regulations made for the safety and convenience of passengers."

In discussing the question under consideration, the Supreme Court of Tennessee in C. O. & S. W. Railroad Co. v. Wells, 85 Tenn. 615 [4 S. W. 5], said: "We know of no rule that requires railroad companies to yield to the disposition of passengers to arbitrarily determine as to the coach in which they take passage."

The case of Day v. Owen, reported in 5 Mich. 525, was an action to recover damages against a defendant because of his refusal to allow Day, a colored man, to take cabin passage in defendant's boat from Detroit to Toledo. One of the defenses interposed was that, by the regulations and established course of the business of the steamboat men, colored persons were not received as cabin passengers, and were not allowed to use the cabin as such passengers, and said regulation and course of business was averred to be reasonable. The court in that case said: "The refusal to allow plaintiff the privilege of the cabin, on his tendering cabin fare, was nothing more or less than denying him certain accommodations while being transported, from which he was excluded by the rules and regulations of the boat. The rules and regulations must be reasonable, and, to be so, they shoulld have for their object the accommodation of the passengers. * * * As the duty of carriers is imposed by law for the convenience of the community at large, and not of individuals, except so far as they are a component part of the community, the law would defeat its own object if it required the carrier, for the accommodation of particular individuals, to incommode the community at large."

The same principle is announced in West Chester &

Phila. Railroad Co. v. Miles, 55 Pa. St., 209. To the same effect is the decision of Com. v. Power, 7 Metc. (Mass.) 596.

In Murphy v. Western A. Railroad Co., 23 Fed. Rep., 637, U. S. Circuit Court, Judge Key in his charge to the jury, said: "Again, I believe that, where the races are numerous, a railroad may set apart certain cars to be occupied by white people, and certain other cars to be occupied by colored people, so as to avoid complaint and friction; but, if the railroad charge the same fare to each race, it must furnish, substantially, like and equal accommodations." It, however, appears in the case supra that the railroad did not furnish equal accommodations, and the colored man was allowed to recover.

In the United States District Court of Maryland, in the case of McGuinn v. Forbes, 37 Fed. Rep. 639, the syllabus of the decision reads as follows: "Plaintiff, an educated colored clergyman, the holder of a first-class ticket on defendant's steamboat, when the supper bell rang, seated himself at the table; and on the captain requesting him to move to another table because the other passengers had complained of his presence, he refused. The captain then had another table fixed up for the other passengers, and plaintiff was left alone, his supper being furnished him. Held, that there was no discrimination against plaintiff on which to base a libel for damages against the owner of the boat."

It was said in the case of Houck v. Southern Pac. Railway Co., in the United States Circuit Court for Texas, reported in 38 Fed Rep., 226, in substance, that a railway company, in the management of its complicated interests, may be authorized in law, on showing a proper or sufficient state of facts, to establish in the opinion of the court the reasonableness of the rule, in setting apart one or more of

its cars for the use exclusively of colored passengers, and a like number, more or less, as the service may require, for the use exclusively of white passengers; but, whenever the company enforces such rule, the company is charged with the duty of furnishing to colored people, who pay first-class fare, cars to ride in that are as safe and comfortable in their conditions and appointments as the cars furnished to white passengers who pay first-class fare.

It will be seen from the authorities cited that the appellant was authorized to establish a rule requiring white passengers and colored passengers to occupy separate coaches; and whether the law relied on by appellant is constitutional or not, yet if it did adopt the requirements of the law as a rule, and the rule was reasonable, all passengers were legally bound to abide by the rule; and it may be safely assumed that such a rule, in this State, is a reasonable rule, and is not unjust either to the white or colored people.

The important question presented for decision is whether or not the Kentucky statute requiring separate coaches or compartments for white and colored passengers is in violation of the Constitution of the United States or of this State. The statute in question is embraced in sections 795-801, inclusive, of the Kentucky Statutes. The assumption by some colored persons, and by some of the white race, to the effect that the statute implies or assumes that the colored race is an inferior race, is not well founded. It is well known that a large portion of the white race is opposed to being required to occupy the same seat, or to travel in the same coaches that are occupied by the colored race, and it is wholly immaterial whether the colored race shares the same feeling in that regard towards the white race or not, but the presumption is

that many of them likewise prefer to occupy seats in coaches not occupied by white persons. But, whether this be true or not, it is manifestly better for the colored race to be separated from the white race than to be placed in the same coach with white persons, with the result that the same would be offensive to the white race; for, if this be true, it would reasonably cause disturbances which would be alike disagreeable and injurious to both races. It seems to us that the law complained of is more nec- essary for the comfort, convenience, and protection of the colored race than of the white race; and it is to be regretted that the law has not been accepted by both races as designed and intended for the mutual benefit, conve- nience, and protection of both races. So far as we are advised, the constitutionality of the statute in question has not been directly passed on by this court, but its val- idity has been recognized in several decisions of this court.

In the case of Quinn, etc. v. L. & N. Railroad Co., 17 Ky. Law Rep. 811 [32 S. W. 742], the court had under consider- ation the claim of appellant, who was a colored lady, for damages against the appellee, based upon the allegation that the appellee permitted a white person to go in and re- main in the car assigned to colored passengers, and which was occupied by her, and while such person was permitted to remain there he used obscene and profane language, thus humiliating and injuring appellant. This court held that she had a cause of action, and reversed the judgment of the lower court on account of error of instructions, the instructions not being sufficiently explicit as to the right of the party to recover. In Louisville & N. R. R. Co. v. Com., 18 Ky. Law Rep. 491 [37 S. W. 79], the court again recognized the validity of the law; and to the same effect is the case of Bailey v. L. & N. Railroad Co., 19 Ky. Law

Rep. 617 [4 S. W. 105]. It seems clear, therefore, that this court has heretofore regarded the statute as valid; and, upon due deliberation, we are of the opinion now that the statute in question is not in conflict with the Constitution of the United States, nor with the Constitution of this State, and we are not aware of any decision of the Supreme Court of the United States that holds the statute in question to be invalid.

The statute of Mississippi of March 2, 1888, required all railroads carrying passengers in that state to provide equal and separate accommodations to the white and colored races. It also provided that all railroad companies that shall refuse or neglect, within sixty days after the approval of the act, to comply with the requirements, should be deemed guilty of a misdemeanor, and upon conviction fined not more than $500. The Louisville, New Orleans & Texas Railway Co. was indicted and fined in the court of Mississippi for failure to comply with the law in question, and, the judgment of the lower court having been affirmed by the Supreme Court of Mississippi, appellant appealed to the Supreme Court of the United States, which court affirmed the judgment of the Mississippi court. In discussing the question, the court said, 133 U. S. 587, [10 Sup. Ct. 348]: "So far as the first section is concerned (and it is with that alone we have to do), its provisions are fully complied with when to trains within the State is attached a separate car for colored passengers. This may cause an extra expense to the railroad company; but not more so than State statutes requiring certain accommodations at depots, compelling trains to stop at crossing of other railroads, and a multitude of other matters confessedly within the power of the State. No question arises, under

this section, as to the power of the State to separate in
different compartments interstate passengers, or to affect,
in any manner, the privileges and rights of such pas-
sengers.  All that we can consider is whether the State
has the power to require that railroad trains within her
limits shall have separate accommodations for the two
races.  That, affecting only commerce within the State,
is no invasion of the powers given to Congress by the com-
merce clause.  In the case of Wabash, St. L. & P. Ry.
Co. v. Illinois, 118 U. S. 557 [7 Sup. Cit. 4], Mr. Justice
Miller, speaking for the court, said:  'If the Illinois
statute could be construed to apply exclusively to con-
tracts for a carriage which begin and end within the
State, disconnected from a continuous transportation
through or into other States, there does not seem to be
any difficulty in holding it to be valid.  For instance, a
contract might be made to carry goods for a certain price
from Cairo to Chicago or from Chicago to Alton.  The
charges for these might be within the competency of the
Illinois Legislature to regulate.  The reason for this is
that both the charge and the actual transportation in such
cases are exclusively confined to the limits of the territory
of the State, and is not commerce among the States, or
inter-State commerce, but is exclusively commerce within
the State.  So far, therefore, as this class of transporta-
tion, as an element of commerce, is affected by the statute
under consideration, it is not subject to the constitutional
provision concerning commerce among the States.  It has
often been held in this court, and there can be no doubt
about it, that there is a commerce wholly within the State,
which is not subject to the constitutional provision; and
the distinction between commerce among the States and
the other class of commerce between the citizens of a

single State and conducted within its limits exclusively is one which has been fully recognized in this court, although it may not be always easy, where the lines of these classes approach each other, to distinguish between the one and the other [quoting the Daniel Ball, 10 Wall. 557; Hall v. De Cuir, 95 U. S. 485; Telegraph Co. v. Texas, 105 U. S. 460].' The statute in this case, as settled by the Supreme Court of the State of Mississippi, affects only such commerce within the State, and comes, therefore, within the principles thus laid down. It comes also within the opinion of this court in the case of Stone v. Farmers' Loan & Trust Co., 116 U. S., 307, [6 Sup. Ct. 334, 388, 1191."]

It will be seen that the appellee in the case at bar purchased a ticket from Hopkinsville to Mayfield, the entire trip being within the State of Kentucky; and, moreover, it appears that she would leave the appellant's road at Princeton, Ky., and there board another train for Mayfield, her destination. It, therefore, seems clear to us that the decision of the Supreme Court, supra, is conclusive of the constitutionality of the act in question, so far as appellees in this case are concerned. It is true that the appellant railroad extends to Evansville, in the State of Indiana, but that fact can in no wise render the statute in question invalid as to the duty of the railroad to respect and enforce the statute in question.

We have also been referred to the case of Plessy v. Ferguson, decided by the Supreme Court of the United States, May, 1896, reported in 163 U. S. 537, [16 Sup. Ct. 1138.] We quote as follows from the opinion of the court in that case: "This case turns upon the constitutionality of an act of the General Assembly of the State of Louisiana passed in 1890, providing for separate railway carriages for the white and colored races. Acts 1890, No. 111, p. 152.

The first section of the statute enacts 'that all railway companies carrying passengers in their coaches in this State, shall provide equal but separate accommodations for the white and colored races, by providing two or more passenger coaches for each passenger train, or by dividing the passenger coaches by a partition so as to secure separate accommodations; provided, that this section shall not be construed to apply to street railroads. No person or persons shall be admitted to occupy seats in coaches, other than the ones assigned to them on account of the race they belong to.' By the second section it was enacted 'that the officers of such passenger trains shall have power and are hereby required to assign each passenger to the coach or compartment used for the race to which such passenger belongs; any passenger insisting on going into a coach or compartment to which by race he does not belong, shall be liable to a fine of twenty-five dollars, or in lieu thereof to imprisonment for a period of not more than twenty days in the parish prison; and should any passenger refuse to occupy the coach or compartment to which he or she is assigned by the officer of such railway, said officer shall have power to refuse to carry such passenger on his train, and for such refusal neither he nor the railway company which he represents shall be liable for damages in any of the courts of this State.' The third section provides penalties for the refusal or neglect of the officers, directors, conductors, and employes of railway companies to comply with the act, with a proviso that 'nothing in this act shall be construed as applying to nurses attending children of the other race.' The fourth section is immaterial. The information filed in the criminal district court charged, in substance, that Plessy, being a passenger between two stations within the State of Louisiana, was assigned by

officers of the company to the coach used for the race to
which he belonged, but he insisted upon going into a coach
used by the race to which he did not belong.   Neither in
the information nor plea was his particular race or color
averred.   The petition for the writ of prohibition averred
that petitioner was seven-eighths Caucasian and one-eighth
African blood; that the mixture of colored blood was not
discernible in him, and that he was entitled to every right,
privilege, and immunity secured to citizens of the United
States of the white race; and that, upon such theory, he
took possession of a vacant seat in a coach where passeng-
ers of the white race were accommodated, and was ordered
by the conductor to vacate said coach, and take a seat in
another, assigned to persons of the colored race; and hav-
ing refused to comply with such demand, he was forcibly
ejected, with the aid of a police officer, and imprisoned in
the parish jail to answer a charge of having violated the
above act.   The constitutionality of this act is attacked
upon the ground that it conflicts both with the thirteenth
amendment of the Constitution, abolishing slavery, and
the fourteenth amendment, which prohibits certain re-
strictive legislation on the part of the States.   That it
does not conflict with the thirteenth amendment, which
abolished slavery and involuntary servitude except as a
punishment for crime, is too clear for argument.   *   *   *
By the fourteenth amendment, all persons born or natural-
ized in the United States, and subject to the jurisdiction
thereof, are made citizens of the United States and of the
State wherein they reside; and the States are forbidden
from making or enforcing any law which shall abridge the
privileges or immunities of citizens of the United States.
or shall deprive any person of life, liberty, or property

[29]

without due process of law, or deny to any person within their jurisdiction the equal protection of the laws. The proper construction of this amendment was first called to the attention of this court in Slaughterhouse Cases, 16 Wall. 36, which involved, however, not a question of race, but one of exclusive privileges. The case did not call for any expression of opinion as to the exact rights it was intended to secure to the colored race, but it was said, generally, that its main purpose was to establish the citizenship of the negro; to give definitions of citizenship of the United States and of the States; and to protect from the hostile legislation of the States the privileges and immunities of citizens of the United States, as distinguished from those citizens of the States. The object of the amendment was undoubtedly to enforce the absolute equality of the two races before the law, but, in the nature of things, it could not have been intended to abolish distinctions based upon color, or to enforce social, as distinguished from political, equality, or a commingling of the two races upon terms unsatisfactory to either. Laws permitting, and even requiring, their separation in places where they are liable to be brought into contact, do not necessarily imply the inferiority of either race to the other, and have been generally, if not universally recognized as within the competency of the state legislatures in the exercise of their police power. The most common instance of this is connected with the establishment of separate schools for white and colored children, which has been held to be a valid exercise of the legislative power, even by courts of States where the political rights of the colored race have been longest and most earnestly enforced. * * * It is claimed by the plaintiff in error that, in any mixed community, the reputation of belonging to the dominant race,

in this instance the white race, is property, in the same sense that a right of action or of inheritance is property. Conceding this to be so, for the purposes of this case, we are unable to see how this statute deprives him of, or in any way affects his right to, such property.   If he be a white man, and assigned to a colored coach, he may have his action for damages against the company for being deprived of his so-called 'property.'   Upon the other hand, if he be a colored man, and be so assigned, he has been deprived of no property, since he is not lawfully entitled to the reputation of being a white man.   In this connection, it is also suggested by the learned counsel for the plaintiff in error that the same argument that will justify the State Legislature in requiring railways to provide separate accommodations for the two races will also authorize them to require separate cars to be provided for people whose hair is of a certain color, or who are aliens, or who belong to certain nationalities, or to enact laws requiring colored people to walk upon one side of the street, and white people upon the other, or requiring white men's houses to be painted white, and colored men's black, or their vehicles or business signs to be of different colors, upon the theory that one side of the street is as good as the other, or that a house or vehicle of one color is as good as one of another color.   The reply to all this is that every exercise of the police power must be reasonable, and extend only to such laws as are enacted in good faith for the promotion of the public good, and not for the annoyance or oppression of a particular class.   *   *   *   So far, then, as a conflict with the fourteenth amendment is concerned, the case reduces itself to the question whether the statute of Louisiana is a reasonable regulation, and with respect to this there must necessarily be a large discretion

on the part of the legislature. In determining the question of reasonableness, it is at liberty to act with reference to the established usages, customs, and traditions of the people, and with a view to the promotion of their comfort, and the preservation of the public peace and good order. Gauged by this standard, we can not say that a law which authorizes, or even requires, the separation of the two races in public conveyances is unreasonable, or more obnoxious to the fourteenth amendment than the acts of Congress requiring separate schools for colored children in the District of Columbia, the constitutionality of which does not seem to have been questioned, or the corresponding acts of State legislatures. We consider the underlying fallacy of the plaintiff's argument to consist in the assumption that the enforced separation of the two races stamps the colored race with a badge of inferiority. If this be so, it is not by reason of anything found in the act, but solely because the colored race chooses to put that construction upon it. The argument necessarily assumes that if, as has been more than once the case, and is not unlikely to be so again, the colored race should become the dominant power in the State Legislature, and should enact a law in precisely similar terms, it would thereby relegate the white race to an inferior position. We imagine that the white race, at least, would not acquiesce in this assumption. The argument also assumes that social prejudices may be overcome by legislation, and that equal rights can not be secured to the negro except by an enforced commingling of the two races. We can not accept this proposition. If the two races are to meet upon terms of social equality, it must be the result of natural affinities, a mutual appreciation of each other's merits, and a voluntary consent of individuals. As was said by the Court of Appeals of New

York in People v. Gallagher, 93 N. Y. 438, 448: 'This end can neither be accomplished nor promoted by laws which conflict with the general sentiment of the community upon which they are designed to operate. When the government, therefore, has secured to each of its citizens equal rights before the law and equal opportunities for improvement and progress, it has accomplished the end for which it was organized, and performed all of the functions respecting social advantages with which it is endowed.' Legislation is powerless to eradicate racial instincts or to abolish distinctions based upon physical differences, and the attempt to do so can only result in accentuating the difficulties of the present situation. If the civil and political rights of both races be equal, one can not be inferior to the other civilly or politically. If one race be inferior to the other socially, the Constitution of the United States can not put them upon the same plane. It is true that the question of the proportion of colored blood necessary to constitute a colored person, as distinguished from a white person, is one upon which there is a difference of opinion in the different States, some holding that any visible admixture of black blood stamps the person as belonging to the colored race (State v. Chavers, 5 Jones, L., 11); others that it depends upon the preponderance of blood (Gray v. State, 4 Ohio, 354; Monroe v. Collins, 17 Ohio St., 665); and still others that the preponderance of white blood must only be in the proportion of three-fourths (People v. Dean, 14 Mich., 406; Jones v. Com., 80 Va., 538). But these are questions to be determined under the laws of each State, and are not properly put in issue in this case. Under the allegations of his petition, it may undoubtedly become a question of importance whether, under the laws of Louisiana, the petitioner belongs to the white or colored

race. The judgment of the court below is therefore affirmed."

It seems to us that the foregoing decision conclusively settles that it was the duty of the appellant to assign to the appellee a coach separate from a coach set apart for white persons. It may be true that the railroad under consideration in the case supra commenced and ended in the State of Louisiana, but we do not think that the court was at all governed in its conclusion by that fact.

It is insisted for appellee that the act under considera-tion undertakes to regulate or control as to inter-State passengers, and that that portion of the statute is invalid,, as being in conflict with the inter-State commerce clause of the United States Constitution, and that the act is in-separable, and therefore it must all be held invalid. We do not think that such contention is tenable. It seems to us that such contention is in conflict with the decision,. hereinbefore referred to, of the Supreme Court of the United States in the case of Louisville, N. O. & T. Ry. Co. v. Mississippi, 133 U. S., 587, [10 Sup. Ct., 348], and also in conflict with the well-settled rules of construction. If it were conceded (which is not) that the statute is invalid as, to inter-State passengers, the proper construction to be given it would then be that the Legislature did not so in-tend it, but only intended it to apply to transportation within the State, and therefore it should be held valid as to such passengers. It seems to us that a passenger tak-ing passage in this State, and railroad companies receiving passengers in this State, are bound to obey the law in re-spect to this matter, so long as they remain within the jurisdiction of the State.

It results from the foregoing that the court erred in giving instruction No. 1, and also erred in refusing the in-

structions asked for by appellant. Judgment appealed from is therefore reversed, and cause remanded for a new trial, upon principles consistent with this opinion.

Separate opinions concurring in the result were delivered by Burnam and Du Relle, justices, as follows:

Judge Burnam delivered a separate opinion as follows:

The validity of the act of the Legislature known as the "Separate Coach Bill" has been approved in a number of decisions rendered by this court; and the opinion of the United States Supreme Court in Plessy v. Ferguson, 163 U. S., 537, [16 Sup. Ct., 1138], in which a majority of that court concurred, seems to finally settle the question as to the constitutional right of the States to pass such laws. If the question were an open one, I should feel it my duty to dissent in this case, as in my opinion the act in question is an unwarrantable interference with the rights of railroad companies to conduct their business in the interest of the general public, and to promote the safety and comfort of their passengers; is founded upon race prejudice, which tends to engender bad feeling between the white and colored races; and is, in its operation, prejudicial to the public welfare.

Judge Du Relle delivered a separate opinion as follows:

It appears to be well settled by adjudicated cases that a railroad company may lawfully adopt a rule of conduct for its passengers in the terms of the separate coach law. It seems to me indisputable that whatever a carrier of passengers may do by regulation the government of the State may, in the exercise of its inherent police power, by law require the carrier to do. The policy of such a law, its ultimate purpose, or the reasons which led to its enactment, are not matter for our consid-

eration. Whether a law is a justifiable exercise of the police power does not depend upon those considerations. That a judge differs with the Legislature upon a question of policy does not authorize him to say that a law in pursuance of such policy is not a legitimate exercise of the police power of the State. For example, a judge may disagree entirely with the reasons which induce a Legislature to adopt a quarantine law. He may believe that the disorder whose spread is thereby sought to be prevented is not infectious or contagious. Such belief, however, would not justify him in holding that the law was not within the inherent police power of the government. And so with regard to the laws for the suppression of lotteries. Illustrations might be multiplied. So believing, and being further of opinion that the question is settled by the majority opinion of the Supreme Court in Plessy v. Ferguson, 163 U. S., 537, [16 Sup. Ct., 1138], I concur with the conclusion reached in the opinion of this court. I do not at all concur in the views therein expressed of the policy or wisdom of the enactment.