## Sweeney v. City of Louisville et al.

February 22, 1949.

466

James A. Crumlin, Alfred M. Carroll, Benjamin F. Shobe and Franklin H. Williams for appellant.

Gilbert Burnett and Lawrence G. Duncan for appellees.

OPINION OF THE COURT BY JUDGE HELM—Affirming.

This is an appeal from a judgment of the Jefferson Circuit Court, Chancery Branch, First Division, dismissing a petition filed by appellant, a colored citizen, for a writ of mandamus against appellees to prevent them "from giving effect to, permit or direct the carrying out, execution or effectuation" of certain resolutions or rules of a former Board of Park Commissioners, adopted by the Director of the Department of Parks and Recreation and to require appellee to admit the appellant and all citizens, irrespective of race or color, who may apply for such admission, to every golf course of the City of Louisville, and to admit them to the amphitheater managed by the Louisville Park Theatrical Association.

The conclusion reached by the learned chancellor in a well considered opinion, made a part of the record, aptly decides the question presented. We adopt it as the opinion of this court. It is as follows:

"Plaintiff, Dr. P. O. Sweeney, a colored citizen and taxpayer, petitions this Court for a writ of mandamus against the City of Louisville, T. Byrne Morgan as Director of Parks and Recreation of the City of Louisville, Louisville Park Theatrical Association and Maurice W. Settle, Business Manager of Louisville Park Theatrical Association, to prevent and restrain the defendants 'from giving effect, to permit or direct the carrying out, execution or effectuation' of certain resolutions or rules of a former Board of Park Commissioners and the Director of the Department of Parks and Recreation, denying the petitioner and other colored citizens, whom plaintiff by amended and supplemental petition claims to represent as a class, the right to use and play upon any and all golf courses and admission to the Amphitheatre, owned by the City of Louisville and under the supervision, direction and control of the defendant, T. Byrne Morgan; and further, that the said defendants be required and directed to admit to each and every golf

course owned by the City of Louisville and under the supervision, direction and control of the defendant, T. Byrne Morgan, the petitioner and all citizens who may apply for such admission, irrespective of race, creed or color.

"Special and General Demurrers were filed by the City of Louisville and the Director of Parks and Recreation, Louisville Park Theatrical Association and its Manager, Settle. Motion by the City of Louisville and Morgan was also made to strike from the petition and prayer so much as affects the rights or seeks relief of others than the plaintiff. The motion to strike was overruled for the sound reason that in the nature of the case it is clear that this is a representative suit such as is authorized by Section 25 of the Civil Code of Practice.

"The special demurrer of the Louisville Park Theatrical Association, Maurice W. Settle as Business Manager of the Association, was properly sustained because of a defect of parties. The petition expressly states that the defendant, Louisville Park Theatrical Association, is an association of citizens, with Maurice W. Settle as Manager. That being the case, it cannot as an association be sued; neither may its manager as such be sued. Civil Code of Practice, Section 24.

"It was not necessary to pass upon the general demurrer, filed by the Association.

"As to the questions raised by the special demurrer, (1) That this being a petition for a writ of mandamus, this court, being a court of equity, has no power to issue such a writ, as such jurisdiction rests in common law, Section 474 of the Civil Code of Practice; (2) That this Court of Equity has no jurisdiction of a mandamus proceeding to control the discretion vested in an officer.

"Although this Court could have evaded the responsibility of adjudicating the rights of the parties in this action by sustaining the special demurrer on the above ground, it has no intention of doing so. Furthermore, under Sections 24.230, 24.240 and 24.250, relating to a court having seven judges, this court has jurisdiction and may try any civil case over which the circuit court has jurisdiction. Only the Criminal Branch of the Jefferson Circuit Court has exclusive jurisdiction under Sec-

tion 137 of the Constitution of Kentucky. All others are concurrent. Therefore, the special demurrer is overruled, thereby permitting this court to pass upon the questions raised by the general demurrer.

"Under the general demurrer it is argued by the City that Morgan, as Director of Parks and Recreation of the City, under Section 97.250 of KRS had the discretionary power to adopt such rules and regulations as would provide for the separation of the white and colored races in the enjoyment of the public parks of the City. To that we agree.

"The further argument is made that this action seeks to compel the Director to exercise his discretionary power in a particular way. However, the plaintiffs argue that, assuming the Director has discretionary power to make rules and regulations for the government of the parks and recreational facilities, he has abused that discretion in arbitrarily, wrongfully and unlawfully formulating and putting into effect the following resolution:

" 'Whereas, it is the opinion of the Board of Park Commissioners of Louisville, Kentucky, that it is neither desirable nor safe that the white people and the colored people of the city should take their pleasure together and use the same parks, playgrounds and swimming pools, and it is also their belief that in the way hereinafter set forth, the recreation plans of the Board can best function and be carried out without injury or friction between the races and with perfect equality to both.

" 'Now, therefore, be it resolved by the Board of Park Commissioners of the City of Louisville: That to accomplish the foregoing purposes that we hereby set apart for the use and the benefit of all persons of the colored race in the City of Louisville the playground and swimming pool at 17th and Magazine Streets, and we further set apart for their use and benefit the Park known as Chickasaw Park, situated on Western Parkway, Baxter Square Playground on Jefferson Street between 12th and 13th Streets, and Ballard Park, north of Caldwell between Jackson and Hancock, together with all amusement devices and appurtenances therein.'

"Plaintiffs argue that the City of Louisville since

1924, by and through its Board of Parks Commissioners, and now since 1942 its Director of Parks, has continued to practice a policy of discriminatory segregation, both as to the white and colored races, in the use of its parks and recreational facilities in violation of the 14th Amendment of the Federal Constitution and the laws of the State of Kentucky; that such a policy amounts to a denial to the plantiff, a citizen of the United States, of the State of Kentucky, of the equal protection and benefit of the laws, deprives the plantiff of his liberty and property without due process of law. Section 1 of the 14th Amendment to the Federal Constitution is as follows:

" 'All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.'

"No other amendment to the Federal Constitution would apply to the facts as outlined in the plaintiff's petition.

"If it should be found that the discretion given to the Director was exercised arbitrarily as aforesaid, then it becomes the duty of this court to restrain his power. To arrive at a correct answer to the question whether or not the rules and regulations so observed and put into effect are in violation of the 14th Amendment, this court has carefully examined the decisions of the Court of Appeals of Kentucky and the Supreme Court of the United States.

"In Ex parte [State of] Virginia, 100 U. S. 339 [25 L.Ed. 676], the court said:

" 'One great purpose these amendments (13th and 14th) was to raise the colored race from that position of inferiority and servitude in which most of them had previously stood, into perfect equality of civil rights with all other persons within the jurisdiction of the States. They were intended to take away all possibility

of oppression by law because of race or color. They were intended to be what they really are, limitation of the power of the states and the enlargements of the power of Congress. They are to some extent declaratory of rights, and though in form prohibitions, they imply immunities such as may be protected by congressional legislation.'

"In that case an act of a judge in selecting jurors was held to be a ministerial act, and he could not exclude persons of color without violating the 13th and 14th Amendments. To the same effect are the following: Pierre v. State of Louisiana, 306 U. S. 354 [59 S.Ct. 536, 83 L.Ed. 757]; Hill v. [State of] Texas, 316 U. S. 400 [62 S.Ct. 1159, 86 L.Ed. 1559].

"The following cases, cited by the plaintiff, involve the denial of the right to vote in primary or general elections and therefore are not applicable to the case before us: Guinn & Beal v. United States, 238 U.S. 347 [35 S.Ct. 926, 59 L.Ed. 1340, L.R.A. 1916A, 1124]; Nixon v. Condon, 286 U. S. [73], 75 [52 S.Ct. 484, 76 L.Ed. 984, 88 A.L.R. 458]; Lane v. Wilson, 307 U. S. 268 [59 S.Ct. 872, 83 L.Ed. 128]; United States v. Classic, 313 U. S. 299 [61 S.Ct. 1031, 85 L.Ed. 1368]; Smith v. Allwright, 321 U. S. 649 [64 S.Ct. 757, 88 L.Ed. 987, 151 A.L.R. 1110].

"Others involved the taking of property as opposed to the due-process clause. Buchanan v. Warley, 245 U. S. 60 [38 S.Ct. 16, 62 L.Ed. 149, L.R.A. 1918C, 210, Ann. Cas. 1918A, 1201]. This is the segregation ordinance case which originated in this court. The ordinance was held invalid because it restrained the alienation of real property in perpetuity and for no other reason. Yu Cong Eng v. Trinidad, 271 U. S. 500 [46 S.Ct. 619, 70 L.Ed. 1059].

"In [State of] Missouri ex rel. Gaines v. Canada, 305 U. S. 337 [59 S.Ct. 232, 236, 83 L.Ed. 208], the exclusion of Negroes from a state-maintained law school was held to be unlawful discrimination and a violation of the 14th Amendment, because no provision was made for a school of law for Negroes at any place in the state, although the state offered to pay their tuition outside of the state. The court in an opinion by Chief Justice Hughes said:

" 'The admissibility of laws separating the races in the enjoyment of privileges afforded by the State rests wholly upon the quality of the privileges which the laws give to the separated groups within the State.'

"There is a clear line of demarcation in all of these cases between political equality (such as the right to serve on juries, the right to vote, to hold and sell property, to earn a livelihood, to secure an education and soc'al equality). This is best illustrated by Plessy v. Ferguson, 163 U. S. 537 [16 S.Ct. 1138, 1140, 41 L.Ed. 256], in an opinion by Mr. Justice Brown:

" 'The object of the amendment was undoubtedly to enforce the absolute equality of the two races before the law, but in the nature of things it could not have been intended to abolish distinctions based upon color, or to enforce social, as distinguished from political, equality, or a commingling of the two races upon terms unsatisfactory to either. Laws permitting, or even requiring, their separation, in places where they are liable to be brought into contact, do not necessarily imply the inferiority of either race to the other, and have been generally, if not universally, recognized as within the competency of the state legislatures in the exercise of their police power. The most common instance of this is connected with the establishment of separate schools for white and colored children, which has been held to be a valid exercise of the legislative power even by courts of states where the political rights of the colored race have been longest and most earnestly enforced.' * * * Dawson v. Lee, 83 Ky. 49.

" 'Laws forbidding the intermarriage of the two races may be said in a technical sense to interfere with the freedom of contract, and yet have been universally recognized as within the police power of the state. State [of Indiana] v. Gibson, 36 Ind. 389 [10 Am.Rep. 42].

" 'The distinction between laws interfering with the political equal'ty of the negro, and those requiring the separation of the two races in schools, theaters, and railway carriages has been frequently drawn by this court. * * * Strauder v. [State of] West Virginia, 100 U. S. 303 [25 L.Ed. 664]; * * * [State of] Virginia v. Rives, 100 U. S. 313 [25 L.Ed. 667]; Neal v. Delaware, 103 U. S. 370 [26 L.Ed. 567]; Bush v. Commonwealth [of Ken-

tucky], 107 U. S. 110, 1 S.Ct. 625 [27 L.Ed. 354]; Gibson v. [State of] Mississippi, 162 U. S. 565, 16 S.Ct. 904 [40 L.Ed. 1075].

"In this state the principle of the social separation of the two races has been universally recognized from the very beginning, and has been written into the statutes of the state and the decisions of the Court of Appeals whenever the question has arisen. It is so well stated by Judge O'Rear in his opinion in the Berea College case it is well worth repeating here:

" 'The maxims of liberty and the pursuit of happiness which are familiar to the common law, wherefrom the idea found in our Bill of Rights is probably borrowed, are the principles worked out by the Anglo-Saxon race for its own government. In no other country has it ever been attempted before, at least on so important a scale, to apply such principles alike to so many different races, types, and creeds of men. The experiment is great in its importance. It forms now one of the biggest questions being worked out by this great North American republic. That much bitterness has appeared, and some oppression has been practiced, are among the inevitable attendants upon the adjustment by people of different races of the rights justly belonging to each. Clashing of antipathies resulting in outbreaks of violence tends to disturb the public peace; threatens the public safety, and so disrupts the serenity of common purpose to promote the welfare of all the people, that the question is become one of the first importance to the section where the two races live in the greatest numbers. That it is well within the police power of government to legislate upon this question so as to repress such outbreaks and to prevent disturbances of the public tranquility, we have no sort of doubt. The seriousness of the situation is not new. Even before the abolition of slavery it was keenly and intelligently anticipated.

" 'Since the emancipation of the negro it has not been the least of the grave problems of government which have been presented to some of the states for solution. As the outcome of discussion, of agitation, of too frequent conflicts, of violent turbulence that set even the law at defiance in some localities and in times of great popular excitement, this species of legislation has

been evolved as tending to a solution of the trouble by removing as far as possible its cause. Is not this situation one, if ever there was one, which calls for and amply justifies the exercise of police power of the government? Or should this irritating cause be left without restraint or control, till by the exhaustion of one side or the other it is settled by the sheer force of superiority of numbers or physical power? It is idle to talk of controlling ideas by legislation, or even by force. You cannot bind an idea by a statute. The attempt should be made, and we believe is being made, in good faith to so control this situation through the law that neither race can have just cause for complaint; so that each may have every lawful privilege and right that the other has; so that equality of rights before the law shall be a fact, as well as a high-sounding theory; yet so as to conserve the very best of the characteristics of each race, to develop its idea of morality, its thrift, independence and usefulness. Observation and study at close hand of both the theory and practical working of this problem of social existence, of the collaboration of two races so different as the white and black in the same state upon a plane of legal equality, where the government is by the people for the people, it has been found, so the legislative department declares, as evinced by the public policy indicated by the statutes discussed in this opinion, that at the very bottom of all the trouble is the racial antipathy to the destruction of its own identity; and that, if that danger is removed, the friction practically disappears. A separation of the races under certain conditions is therefore enforced, where it is believed that their mingling would tend to produce the very condition which is found to lie at the base of the trouble. In its application it becomes all the more necessary that the overmastering principles included in the police power of the government be firmly recognized, so that a clashing of race prejudices, or race destruction, may be lawfully averted.' Berea College v. Com., 123 Ky. 209, 94 S.W. 623, 626, [124 Am.St.Rep. 344, 13 Ann. Cas. 337].

"That judgment was affirmed by the Supreme Court of the United States in 211 U.S. 45 [29 S.Ct. 33], 53 L.Ed. 81.

"As late as March 28, 1930, the identical rules and

regulations which are now being attacked were upheld by our Court of Appeals as reported in Warley et al. v. Board of Park Commissioners et al., 233 Ky. 688, 26 S.W.2d 554, 556, in the following language:

" 'They cite the case of City of Louisville v. Parsons, 150 Ky. 420, 150 S.W. 498, wherein we held the city council of Louisville could not delegate to certain commissioners the authority to make certain employments and incur certain expenses, and from that they argue the Legislature could not empower this defendant board to make rules, regulations, etc. They overlook the vast difference between the power of the General Assembly and the city council of Louisville. One is a creator, the other is a creature. One is a sovereign, the other is a subject.

" 'Next they cite the Fourteenth Amendment to the Constitution of the United States, because of which they say the rules and regulations complained of are invalid. To go into this would be but a rethrashing of old straw. These questions have all been settled. See Hall, Adm'x, v. DeCuir, 95 U. S. 485, 24 L.Ed. 547; Chiles v. Chesapeake & O. Ry. Co., 218 U.S. 71, 30 S.Ct. 667, 54 L.Ed. 936, 20 Ann.Cas. 980; Plessy v. Ferguson, 163 U. S. 540, 16, S.Ct. 1138, 41 L.Ed. 256; Ohio Val. Ry.'s Receiver v. Lander, etc., 104 Ky. 431, 47 S.W. 344, 882, [48 S.W. 145], 20 Ky.Law Rep. 913; Shelton v. Chicago, R. I. & P. R. Co., 139 Tenn. 378, 201 S.W. 521, L.R.A. 1918D, 707.'

"It is obvious that the rights attempted to be secured in this case are social and not political; that plaintiff seeks to commingle with the members of the white race in the enjoyment of summer opera and to play golf with white persons in a park set aside for the use of members of the white race. To grant the relief which the plaintiff seeks would compel white persons to associate with colored persons, whether it were to their pleasure or not. This would be an infringement on the rights of white persons who would object to being compelled to commingle with colored persons. This in no way is a reflection on the members of the colored race, for they have among their number many who have honored their race by their contribution to the higher arts and sciences; but the realistic fact remains, 'like at-

tracts like,' and it is just plain human nature for persons of the same tastes and desires, whether they be black or white, to associate together for the purpose of enjoying themselves to the best advantage. That fact accounts for the separate strata of society even among members of the same race. People move in circles wherein they are likely to be suited or matched.

"If it were possible to grant the plantiff the social relief he seeks, where should the line be drawn? Should one in another stratum of society other than the one in which the plaintiff moves in his own race, whether it be on a higher or a lower level than his own, demand the same relief and this Court grant it, could it be assumed that the strata would by court action be eliminated? It would merely result in one stratum moving in and the other out. So in the natural course of events, should the white race be compelled to accept into the enjoyment of its parks and amphitheater with all of its recreational facilities, the members of the colored race, and the white race move out and the colored possess it, the net result would be that the right to the enjoyment of parks would be denied to the white race; and the process would be continued ad infinitum.

"Social equality between persons of the white and colored races, or in fact between persons of the same race, cannot be enforced by legislation or by the courts, nor can the voluntary association of persons of different races, or persons of the same race, be constitutionally prohibited by legislation or the courts, unless such association is shown to be immoral, disorderly, or for some other reason so palpably injurious to the public welfare as to justify a direct interference with the personal liberty of the citizen.

"The best solution of this social problem, and that which has proved to be the best for both the white and black race, is to provide separate facilities for each.

"The next question posed by the petition is whether or not the City through its Director of Parks and Recreation provided facilities for the use and enjoyment of its colored citizens equal to that provided for its white citizens. It appears from the petition, and the court takes judicial knowledge of the fact, that the amphi-

theater was erected by an Association of the citizens of the white race and paid for by them, and the site upon which the amphitheater was erected in Iroquois Park, which is a public park of the City, was leased by the Association from the City of Louisville through the Director of Parks, and that the Director of Parks has no control over the actual theater, as it is managed and controlled by the Association.

"The denial of admission to the amphitheater was made by the Association, not by the Director of Parks; and even if the Association were properly a party to this action, that denial of the right of admission would be a proper exercise of the rights of the Association. Insofar as the use of the amphitheater is concerned the petition is defective in that it does not allege that the plaintiff and those whom he represents among the colored race have ever made application to form an association and erect an amphitheater in one of their own parks as a facility which has been granted to those of the white race as represented by the Park Theatrical Association. If that permission were requested of the Director of Parks it would be necessary, under the cases which we have just discussed and mentioned herein, for the Director to grant that permission under the same conditions granted to the white race in the formation of their Association.

"The same is true as to the golf courses. There is no allegation in the petition that they have requested permission to erect or construct golf courses, club houses, lockers, showers, club rooms and facilities for golf professionals in the park set aside for enjoyment of the colored race, or that they have requested the City to erect an amphitheater or to construct golf courses within their own parks. If that request had been made and refused, it is the opinion of this court that the petition would have stated a cause of action, but it does not appear to the court from the pleadings that such has been done.

"For the reasons herein stated the general demurrer of the City of Louisville and T. Byrne Morgan, the Director of Parks and Recreation, must be and is sustained."

The judgment of the chancellor is affirmed.