vides: "Any person arrested under *capias ad satisfaciendum* for any debt contracted after the 1st day of May next, may give bond to appear, &c., and shall not be confined in jail, as before."

I am aware, that in several of the States decisions have been made sustaining homestead laws. These cases all rest on the fallacy of assuming the power to make exemptions to some extent, and then, on the idea of Legislative discretion, the amount is swelled up to thousands; and it is justified on the ground of "keeping pace with the progress of the age," a progress in this particular, I fear, of dishonesty and fraud. I choose to rely on the cases in our own Court. *Jones* v. *Crittenden*, 1 Car. Law Rep. 385. *Barnes* v. *Barnes* 8 Jones 366.

PER CURIAM.                              Order below reversed;
                              Let this be certified.

---

THE STATE *v.* WESLEY HAIRSTON and PUSS WILLIAMS.

The provisions of the Act (Rev. Code, c. 68, s. 7) declaring intermarriages between whites and persons of color to be *void*, are still in force in this State; not having been affected by recent changes of the Constitution of the State, or of the United States; or by the Civil Rights Bill.

(*S.* v. *Underwood, ante* 98, cited and approved.)

INDICTMENT for Fornication and Adultery, tried before *Cloud*, J., at Spring Term 1869 of the Superior Court of FORSYTHE.

Upon the trial it appeared that the defendant Hairston was a colored man, and the defendant Williams a white woman; and that they were cohabiting as man and wife at the time of the finding of the bill. The defence was that they had been duly married. The facts established a marriage, if such relation could exist between parties, one of whom is colored and the other white.

His Honor instructed the jury, that by the law of the State the alleged marriage in this case was a nullity.

Verdict, Guilty; Rule for a New Trial; Rule discharged;. Judgment, and Appeal by the defendants.

*Attorney General* for the State.

No counsel, *contra.*

READE, J. The only question in this case is, whether the intermarriage of whites and blacks is lawful.

By our Marriage Act, "All marriages since the 8th of January, 1839, and all marriages in future between a white person and a free negro, or a free person of color to the third generation, shall be void."—Rev. Code, c. 68, s. 7.

Late events, and the emancipation of the slaves, have made no alteration in our policy, or in the sentiments of our people. And lest it might be supposed that there was, or would be, a change, the Legislature, in 1866, re-enacted the marriage act. And thus the law stood at the time of the adoption of our new Constitution. The Constitution was adopted by a large popular vote, both whites and blacks voting. In the Constitution it is provided that, "the laws of North Carolina, not repugnant to this Constitution, or to the Constitution and laws of the United States, shall be in force until lawfully altered." Art. IV, S. 24.

It thus appears that we have not only the plain letter of the acts of the Legislature; but the sanction of the Constitution, that the intermarriage of whites and blacks is against public policy, and is unlawful. And as this is a matter affecting the social and domestic relations, it is gratifying to know that the law has the sanction of both races. It is no discrimination in favor of one race against the other, but applies equally to both. At the last term, in the case of the *State* v. *Underwood, ante* 98, we decided that the act forbidding persons of color to be witnesses, except against each other, was repealed by the Constitution, as being repugnant to its spirit, and inconsistent with our altered condition. But that was because there was a discrimination between the races in civil rights. Here there is no discrimination. The law operates upon both

races alike; neither can marry the other; nor is it repugnant to the spirit of the Constitution, or subversive of civil rights, but is in consonance with both.

It was insisted that the Civil Rights Bill has declared a different policy, and has changed the law. It is not necessary that we should decide whether the operation of that bill ended with the cessation of our Provisional relations with the United States, or whether it is operative now; for by its terms it has no application to the social relations. Its object was, and its terms are, to declare equality between all citizens without regard to race or color, in the matters of making business contracts, suing in the Courts, giving evidence, acquiring property, and in the protection of person and property. And this is nothing more than our own State Constitution has done. But neither the Civil Rights Bill, nor our State Constitution was intended to enforce social equality, but only civil and political rights. This is plain from their very terms; but if the terms were doubtful, the policy of prohibiting the intermarriage of the two races is so well established, and the wishes of both races so well known, that we should not hesitate to declare the policy paramount to any doubtful construction.

The marriage relation is a peculiar and important one. The Courts treat it as a contract, only in the sense that contract—consent of parties—precedes it, and is essential to its validity. But when formed, it is more than a civil contract, it is a *relation,* an *institution,* affecting not merely the parties, like business contracts, but offspring particularly, and society generally. And every State has always assumed to regulate it, and to declare who are capable of contracting marriage,—what shall be the ceremony, what shall be the duties and privileges, and how it shall be dissolved. These things have never been left to the discretion of individuals, but have been regulated by law. Among other things, our marriage law declares that the white and colored races shall not intermarry. The pretended marriage in this case was, therefore, invalid, and the parties guilty of fornication and adultery.

Let this be certified, &c.

PER CURIAM.                                    No Error.