Smith v. State.

*SMITH v. STATE.

(*Nashville.* March 12, 1898.)

COMMON CARRIER. *Statute requiring separate accommodations for the races, valid.*

A state statute providing for separate but equal accommodations on railroads for the white and colored races, both as to passengers traveling interstate and intrastate, is a reasonable and valid police regulation, and not an objectionable regulation of interstate commerce.

Cases cited: 95 U. S., 485; 163 U. S., 299, 537; 165 U. S., 628; 166 U. S., 427; 133 U. S., 587.

FROM DAVIDSON.

Appeal in error from the Criminal Court of Davidson County. J. M. ANDERSON, J.

SMITH & MADDIN for Smith.

Attorney-general PICKLE for State.

SNODGRASS, C. J. The plaintiff in error was indicted and convicted under the Act of 1891, Ch. 52, for unlawfully failing, neglecting, and refusing to assign certain negroes to the car and compartment of car used on the Louisville & Nashville Railroad

*As to the rights of colored passengers, the authorities are collected in a note to Ex parte Plessy (La.), 18 L. R. A., 639.—REPORTER.

for colored passengers, and for permitting them to ride in the car and compartment thereof assigned to white passengers. He appealed, and contests here the correctness of the judgment, upon the ground that the Act referred to is invalid, as a regulation of interstate commerce, and in violation of the Constitution of the United States on that subject, Article 1, Section 8, of which vests in Congress the power to regulate commerce with foreign nations, and among the States, and with the Indian tribes.

It is insisted, and authorities cited to the effect, that the States have no power to regulate interstate commerce, and that the transportation of passengers from points without to points within the State, or outside, is such commerce, and beyond the power of State regulation.

It is admitted that the Act, so far as it operates to regulate commerce within the State, is valid, but it is urged that it is invalid as applied to the case of those passengers taken into the car without the State to be brought within or transported through it, as was the case in this instance, and it is urged that the question is so decided by the Supreme Court of the United States in the case of *Hall* v. *De Cuir*, 95 U. S., 485.

If the contention of plaintiff in error as to the effect of this decision was correct, we would hold that decision conclusive and reverse the judgment, for we not only recognize the right of that Court to determine that question, but we regard its adjudi-

Smith *v.* State.

cations as always correct within its province, until reversed or changed by itself, and accord to them that unhesitating respect which is due the Supreme Court of the United States as our own highest Court for the settlement, and rightful settlement, of all questions which our Federal Constitution and laws submit to its judgment. If there be any Courts of the States which question or attempt to avoid its decisions, either as unauthorized or unjust because not in harmony with any judicial or political theory of their own, this Court is not one of them. We bow to its decisions not only as right, but as just and proper expositions of the constitutional or legal questions it decides, treating it not as a foreign tribunal because national in contradistinction to State, but as our own, and entitled to as much consideration as if it were organized to determine such questions alone for this State, and more, because it is the supreme power which we have created for the ultimate settlement of all such controversies in all the States of our common government. But we are of the opinion that the question here involved was not decided in the case referred to, and, upon the aspect here presented, was not even considered.

The question there was this : Under the Constitution of Louisiana all persons were given equal rights and privileges upon any conveyance of a public character, and the Legislature of that State provided, substantially, that all persons should be carried together in public conveyances. A car-

Smith *v.* State.

rier engaged in interstate commerce, under a regulation adopted for that purpose by itself, provided separate accommodations for white and colored passengers through that State and others adjacent. A colored passenger applied for transportation from New Orleans to Hermitage, both points within the State of Louisiana, and being refused accommodations, on account of her color, in the cabin specially set apart for white persons, brought suit in the Eighth District Court for the Parish of New Orleans, under the Louisiana Act, to recover damages for her mental and physical sufferings. She obtained a judgment for $1,000. Defendant appealed to the Supreme Court of the State, and the judgment was affirmed. The case was carried to the Supreme Court of the United States, under Section 709 of the Revised Statutes. That Court held that the law as construed by the State Court (which construction was conclusive upon Supreme Court of the United States) gave to all persons traveling in Louisiana upon public conveyances, though engaged in interstate commerce, equal rights and privileges in all parts of the conveyance, without distinction or dist crimination on account of race or color, and deal with it, upon that aspect alone, as an effort to regulate interstate commerce by the State, and not as a police measure, which it was not, and in which aspect, therefore, was not considered. It was held to be a regulation of interstate commerce, and to be void, because such power was vested alone in

Congress to be exercised, and whether it had done so or not, the State could not do it by such a law.

The Court said in that case: "There can be no doubt but that exclusive power has been conferred upon Congress in respect to the regulation of commerce among the several states. The difficulty has never been as to the existence of this power, but as to what is to be deemed an encroachment upon it, for, as has often been said, 'legislation may, in a great variety of ways, affect commerce and persons engaged in it without constituting a regulation of it, within the meaning of the Constitution.' *Sherlock* v. *Ailing*, 93 U. S., 103; State Tax on Railroad Gross Receipts, 15 Wall., 284.

"Thus, in *Munn* v. *Illinois*, it was decided that the State might regulate the charges of public warehouses, and in *Railroad Co.* v. *Iowa*, 4 Otto, 155, of railroads situate entirely within the State, even though those engaged in commerce among the States might sometimes use the warehouse and the railroads in the prosecution of their business. So, too, it has been held that States may authorize the construction of dams and bridges across navigable streams, situate entirely within their respective jurisdictions. *Wilson* v. *Blackbird Cr. M. Co.*, 2 Pet., 245; *Pound* v. *Turk*, 5 Otto, 459; *Gilman* v. *Philadelphia*, 3 Wall., 713. The same is true of turnpikes and ferries. By such statutes the State regulates, as a matter of domestic concern, the instruments of commerce situated wholly within their own jurisdiction,

Smith *v.* State.

over which they have exclusive governmental control, except where employed in interstate commerce. As they can only be used in the State, their regulation for all purposes may properly be assumed by the State, until Congress acts in reference to their foreign or interstate relations. When Congress does act, the State laws are superseded only to the extent that they affect commerce outside the State as it comes within the State. It has also been held that health and inspection laws may be passed by the States (*Gibbons* v. *Ogden*, 9 Wheat., 1), and that Congress may permit the States to regulate pilots and pilotage, until it shall itself legislate upon the subject. *Cooley* v. *Board of Wardens*, 12 How., 299. The line which separates the power of the States from this exclusive power of Congress, is not always distinctly marked, and oftentimes it is not easy to determine on which side a particular case belongs. Judges not unfrequently differ in their reasons for a decision in which they concur. Under such circumstances it would be a useless task to undertake to fix an arbitrary rule by which the line must, in all cases, be located. It is far better to leave a matter of such delicacy to be settled in each case upon a view of the particular rights involved." Nothing better illustrates the last suggestion of the learned Judge than his own view, as enforced by citations in the particular case.

The proposition suggested was the power of the State to regulate internal commerce, and upon this

he indiscriminately cited cases so holding along with those which did hold a wider power to exist in the State, when it belonged to that class known as the police power, which he was not considering. The Louisiana Constitution and Act were not dependent upon or in the exercise of such a power. A requirement that all persons who travel shall travel together, is not in any sense a police regulation. It is easy to perceive how it might conduce to the comfort, health, or safety of persons traveling to be separated, but no reason of this kind can be found, nor any other of a police nature, for requiring that all should be crowded or mixed together. And, presumably, therefore, as it did not arise, no such question was made. It certainly was not considered or decided in that case. The reference to authorities (some of which do relate to it) was only on a proposition as to the State's right to legislate upon domestic matters, but the reference included several which showed that such a right, if exercised under a valid law in respect to matters included in the police powers of the States, might be lawfully exercised, if so directed, although it seriously affected interstate commerce. No such distinction was there made, though later it was done, and with great force, by the same Court.

As already said, it was not presented as a police regulation. It was not such, but was a regulation, pure and simple, of interstate commerce. It was not an Act passed in the exercise of a police power.

It was based upon no such power, nor did it purport to be. The decision that it was, hence, not a valid law, was a matter of course. But, in the same opinion, Judge Waite, to enforce the idea of the impropriety of such a State regulation, read an argument supposed to be applicable to any regulation or any law affecting the transportation of passengers, showing the great hardship and inconvenience to which interstate carriers would be subjected upon a different construction. He said: "If each State was at liberty to regulate the conduct of carriers while within its jurisdiction, the confusion likely to follow could not but be productive of great inconvenience and unnecessary hardship. Each State could provide for its own passengers and regulate the transportation of its own freight regardless of the interests of others. Nay more, it could prescribe rules by which the carrier must be governed within the State in respect to passengers and property brought from without. On one side of the river or its tributaries he might be required to observe one set of rules, and on the other, another. Commerce cannot flourish in the midst of such embarrassments."

This was a very persuasive view on the mere question of confining a State's regulation of commerce to its own borders, when no necessity of health, comfort or safety, and no proper police regulation was involved. It is urged here, and has been so urged in all such cases since, but the argu-

ment has been distinctly rejected by the Supreme Court of the United States in several cases where the law considered was one enacted under the police power, and was (of course) a reasonable exercise of that power. The question was practically a new one when the opinion of Judge Waite was delivered, and the application of the rule as to the power of the States to affect interstate commerce by legislation in the formative state, and in much confusion, as he himself shows. Since that time, it has been much considered and debated, and many opinions have been delivered which mark far more distinctly, and far more accurately, "the line which separates the powers of the States from this exclusive power of Congress," which, at that time, the learned Judge observed to be so uncertainly and indistinctly marked.

The cases subsequent to this, in connection with it, and those preceding, have established three distinct propositions:

First, that any legislation by a State, whether it be or not in the exercise of the police power, though it incidentally and remotely affect interstate commerce, without constituting a regulation of it, may be valid.

Second, that in the reasonable exercise of the police power, a state may impose burdens upon interstate commerce, which occasion both inconvenience and hardship to the carrier, provided Congress has not directly acted upon the same subject.

Third, that laws passed under the police power

of the State, for the reasonable regulation of travel and transportation, are not regulations of interstate commerce, in the objectionable sense, under the Constitution.

Specifically they have also settled, fourth, that laws providing for the separation of the white and colored races in public conveyances, giving each equal privileges of travel and accommodation, are reasonable, and are valid exercises of State authority under the police powers, although they affect and impose burdens upon interstate commerce. *Plessy* v. *Ferguson*, 163 U. S., 537; *Hennington* v. *Georgia*, 163 U. S., 299; *N. Y. & H. R. R. Co.* v. *New York*, 165 U. S., 628; *Gladson* v. *Minnesota*, 166 U. S., 427; *Railway Co.* v. *Mississippi*, 133 U. S., 587.

In the first of these cases, such a statute, not applying to interstate commerce, was upheld as a police regulation which was reasonable, and as not obnoxious to the Thirteenth or Fourteenth Amendments to the Constitution of the United States. Judge Harlan dissented, with the ability and vigor for which that distinguished Judge is noted, and with the vehemence and want of strict accuracy pardonable because general, if not universal, in unanswered dissent, in which he supposed instances of unreasonable exercise of that power, in opposition to the argument that its reasonable exercise was justified, and was not obnoxious to the Federal Consti-

tution, which proposition alone the majority opinion maintained.

But the decision in the second case commented upon here, *Hennington* v. *Georgia*, was delivered by Judge Harlan, and in this, with great clearness and accuracy, the distinction was asserted between general legislation to regulate commerce and special, reasonable legislation, under the police power, to provide for the health, safety, well-being, comfort, and morals of the public, and that the right of the State to exercise this power existed, and that if such legislation did not go beyond the necessities of the case it was valid, at least until Congress interferes. He enforces this view with much strength of reasoning and citation of authority, and, indeed, reiterates a view which may go beyond this, for in the conclusion of his opinion he says: "Local laws of the character mentioned have their source in the powers which the States reserved and never surrendered to Congress, of providing for the public health, the public morals, or the public safety, and are not within the meaning of the Constitution, and considered, in their own nature, regulations of interstate commerce simply because for a limited time, or to a limited extent, they cover the field occupied by those engaged in such commerce."

It is worthy of note here that the Judge is not limiting the field of State legislation to questions of health, morals, and safety. These happen merely to be those subjects of police legislation which he enu-

merated in the particular statement quoted, but else-
where he had spoken of those relating to the order,
the comfort, and the well-being of the public; but
neither does this addition make the list complete.
What was intended, and all that was intended to be
expressed, was that those subjects included in the
police power of the State were not surrendered to
Congress by the grant of any other powers, not ex-
pressly including any one or more of them. The
body of the opinion is devoted, though, to maintain-
ing the proposition suggested, that the power remains
in the State until Congress has acted. In reference
to this, he says: "The distinction here suggested is
not new in our jurisprudence. It has been often
recognized and enforced in this Court. In *Gibbons*
v. *Ogden*, 22 U. S., this Court recognized the pos-
session by each State of a general power of legisla-
tion that embraces everything within the territory
not surrendered to the general government, all which
can be most advantageously exercised by the States
themselves. Inspection laws, although having, as the
Court said in that case, a remote and considerable
influence on commerce, are yet within the authority
of the States to enact, because no direct general
power over the objects of such laws was granted to
Congress. So, also, quarantine laws of every descrip-
tion, if they have real relation to the objects named
in them, are to be referred to the power which the
States have to make provision for the health and
safety of their people."

It is immaterial upon which theory it be treated as rested, whether upon that that the power never was vested in Congress to so regulate interstate commerce as to destroy the power of State police regulation, or whether upon the proposition that such power vested could not destroy it until exercised, the result is the same, for it is not pretended, in the case under consideration, that Congress, if it has the power, has yet undertaken to legislate on the particular subject, or to forbid the exercise ·by the State of the police power to control this question.

It was not a new suggestion that the power granted to regulate commerce was not unlimited, or was not intended to give Congress such power, where the regulation attempted was· contrary to the proper and reasonable police regulations of the different States. As pointed out by Judge Clifford in his concurring opinion in the case of *Hall* v. *De Cuir*, referring to Chancellor Kent's analysis of the view of the Supreme Court of the United States in the case of *Gibbons* v. *Ogden*, there were three limitations or restrictions on the power conferred upon Congress to regulate interstate commerce. They were (1) that the power did not extend to that commerce which is completely internal, and is carried on between the different parts of the same State not extending to or affecting other States; (2) that the power is restricted to that commerce which concerns more States than one, the completely internal commerce of the State being reserved for the State itself; (3) that

the power conferred does not prohibit the States from passing inspection laws, or quarantine or health laws, or laws for regulating highways and ferries, nor does it include the power to regulate the purely internal commerce of a State or to act directly on its system of police.   Citing 1 Kent's Commentaries (12th Ed.), 437.

Later, in commenting on the opinion and contrasting it with another delivered by the same Judge (Chief Justice Marshall), Judge Clifford says: "Evidently he had no occasion to refer to it or to any of its doctrines, as he properly described the creek over which the dam was erected as a low, sluggish water of little or no importance, and treated the erection of the dam, as one adapted to reclaim the adjacent marshes and as essential to the preservation of the public health, and sustained the constitutionality of the law authorizing the erection, upon the ground that it was within the reserved police powers of the State."   But we need not pursue this subject further, for, as already stated, whether these powers remain always in the State, as not granted, or whether they remain until congressional action, is immaterial.   In either event the law we are considering is valid so far as this constitutional objection goes.   It remains only to consider whether it is a proper and reasonable exercise of the police power of the State, for, as was said in *Plessy* v. *Ferguson,* "every exercise of the police power must be reasonable, and extend only to such laws as are enacted

in good faith for the promotion of the public good, and not for the annoyance or oppression of a particular class.''

The caption and body of the Act are as follows:

''AN ACT to promote the comfort of passengers on railroad trains by requiring separate accommodations for the white and colored races.

''SECTION 1. *Be it enacted by the General Assembly of the State of Tennessee*, That all railroads carrying passengers in the State (other than street railroads) shall provide equal, but separate, accommodations for the white · and colored races, by providing two or more passenger cars for each passenger train, or by dividing the passenger cars by a partition, so as to secure separate accommodations; *Provided*, That any person may be permitted to take a nurse in the car or compartment set aside for such persons; *Provided*, That this Act shall not apply to mixed and freight trains which only carry one passenger or combination passenger and baggage car; *Provided always*, That, in such cases, the one passenger car so carried shall be partitioned into apartments—one apartment for the whites and one for the colored.

''SEC. 2. *Be it further enacted*, That the conductors of such passenger trains shall have power, and are hereby required, to assign to the car, or . compartments of the car (when it is divided by a partition), used for the race to which such passengers belong; and should any passengers refuse to occupy the car to which he or she is assigned by

such conductor, said conductor shall have power to refuse to carry such passenger on his train, and for such refusal neither he nor the railroad company shall be liable for any damages in any Court of this State.

"Sec. 3. *Be it further enacted,* That all railroad companies that shall fail, refuse, or neglect to comply with the requirements of Section 1 of this Act, shall be deemed guilty of a misdemeanor, and, upon conviction in a Court of competent jurisdiction, be fined not less than one hundred nor more than five hundred dollars; and any conductor that shall fail, neglect, or refuse to carry out the provisions of this Act, shall, upon conviction, be fined not less than twenty-five nor more than fifty dollars for each offense.

"Sec. 4. *Be it further enacted,* That this Act take effect ninety days from its passage, the public welfare requiring it."

It will be seen that the Act provides for separate accommodations, but for equal accommodations. It imposes no burden on either race, and gives to each the same privileges. Even in the matter of carrying nurses of another race, it gives to the colored passenger the same right to take a white nurse into the car for colored people that it does to the white passenger to take a colored nurse into that provided for white people. It is entitled, if that were material, "An Act to promote the comfort of passengers." It may operate for this purpose or

to promote the safety of one or both, or to further the ends of good order. If it be true, as is sometimes said, that race prejudices exist here that make it uncomfortable or unsafe or promotive of disorder to mix the races in public conveyances, then both safety and good order are promoted as well as comfort, in their separation. The State is to judge of the necessity for such a regulation. Whether either or both should be uncomfortable, unsafe, or liable to the injury or annoyance of disorder by such intermixture in travel, is not the question. The question is whether it in fact is so, or whether the State Legislature reasonably deemed it so and provided against the consequences. It is in these respects, therefore, entirely reasonable.

No good reason can be perceived why such legislation is objectionable, or why it might not even be extended. If California, or any of the States of the West, should take a like view as to intermixture of their Chinese population with that of native or white people in public conveyances, it seems clear that, for the same reasons, they might enact the same laws, and, indeed, yet others for the separation of other races who might be hostile or prejudiced toward each other. The argument that it imposes unnecessary burdens on the carrier, to which so much weight was given in the DeCuir case, is not relevant, if it be a police regulation of a reasonable and proper character. The same argument was made, and on this ground repudiated, in the

cases of *R. Co.* v. *N. Y.*, 165 U. S., p. 628, and *Hennington* v. *Georgia*, 163 U. S., 299.

We conclude, therefore, that the law is a reasonable police regulation, and applies to both intra and interstate travel; that it is not invalid for any reason, or obnoxious to the Federal Constitution; that the question is an open one, under the decision of the Supreme Court of the United States, and that there is no reversible error in the judgment of the Court below.    It is therefore affirmed.