Case 27.—PROSECUTION AGAINST BEREA COLLEGE FOR MAINTAINING AN INSTITUTION OF LEARNING IN THIS STATE WHERE PERSONS OF THE WHITE AND NEGRO RACES ARE RECEIVED.—Two indictments, heard together June 12.

## Berea College v. Commonwealth.

Appeal from Madison Circuit Court.

J. M BENTON, Circuit Judge.

Judgment in both indictments against the defendant. Affirmed in one and Reversed in the other.

1. Constitutional Law—Police Power—Schools for White and Colored Persons—Act March 22, 1904, p. 181, c. 85, in so far as it prohibits and imposes a punishment for maintaining and operating an institution of learning in which white and colored persons may be taught at the same time and in the same place, is within the police power, and valid.
2. Same—Act March 22, 1904, p. 181, c. 85, in so far as it prohibits maintenance by any institution of learning of separate and distinct branches for white and colored persons less than 25 miles distant from each other, is unreasonable, and not within the police power.
3. Same—Equal Protection of Law—Due Process of Law—Act March 22, 1904, p. 181, c. 85, prohibiting the maintenance and operation of any institution of learning where persons of the white and negro races are both received, is not a deprivation of equal protection of the law, or of due process of law.
4. Same—Vested Rights—The right to teach white and negro children in a private school at the same time and place is not a property right.

BARKER, J., dissenting in part.

J. G. CARLISLE, G. W. MALLON and C. F. BURNAM, attorneys for appellants.

### POINTS AND AUTHORITIES.

We submit that any act which would seek to prevent Berea College from educating both races together would be in contravention of all of the inhibitions of the Fourteenth Amendment.

First—It would abridge the privileges and immunities of citizens of the United States.

(A) The trustees of the corporation—Their privilege to expend their own money and their labor in the establishment and maintenance of a private institution for a worthy object would be abridged.

(B) Each and every teacher in the United States—His or her right to pursue in Kentucky the innocent and laudable occupation of teaching would be abridged.

(C) Each and every person in the United States—His or her right to seek instruction, elevating in character, wherever he or she sees fit, and upon invitation, voluntarily to associate, in so far as it may be necessary for the purpose of receiving an education, with any person of good moral character with whom he may so desire to associate.

Second—By its enactment the State of Kentucky would seek to deprive persons of liberty and property without due process of law.

(A) Teachers—The rights to earn one's living in the pursuit of a lawful calling not interfering with the rights of others, a property right.

(B) Pupils—The right to prepare one's self to earn a living by seeking an education where the opportunity offers and none objects to his presence—a property right.

These rights are also liberties. Space has prevented a discussion of "liberty"; suffice it here to refer to Bertholf v. O'Reilly, 74 N. Y., 515, where it is expressly decided that one can be deprived of his liberty in a constitutional sense without putting his person in confinement, and that a man's right to exercise his faculties and to follow a lawful avocation for the support of life, is a constitutional right of liberty. (See also Cooley on Constitutional Limitations, sec. 393.)

(C) The Trustees—the right to establish and maintain a school is a property right.

(D) The College—By rendering some of its donations subject to forfeiture, a direct pecuniary loss would be sustained.

As to all of the above, the imposition of a fine is in itself a taking of property.

Third—By its enactment the State of Kentucky would seek to deny persons within its jurisdiction of the equal protection of the laws.

If mere voluntary association in the pursuit of a worthy object, is the act which justifies State interference, then must such association be prevented in churches, in factories, in labor on the streets,—everywhere.

On "Equal Protection" see Yick Wo. v. Hopkins 118 U. S. 356.

Berea College v. Commonwealth.

## AUTHORITIES CITED.

Field v. Clark, 143 U. S. 649; Pollock v. Farmers Loan & Trust Company, 158 U. S. 601; Cummings v. Missouri, 4 Wall. U. S. 321; Readiger v. the States Zeitung, 79 N. Y. Sup. Ct. Cooley on Constitutional Limitations, Sec. 441; Eastman v. Commonwealth, 22 Ky. Rep. 157; Mugler v. Kansas 123 U. S. 623, 661-663; Pearsall v. Gt. Nor. Ry. 161 U. S. 646; Butcher's Union Company v. Crescent City Company, 111 U. S., 756; Lawton v. Steele 152 U. S. 133-136; The Slaughter House Cases 83 U. S. 36; Strauder v. West Virginia, 100 U. S. 303; Virginia v. Rives, 100 U. S. 313; Bush v. Kentucky, 107 U. S. 110; Bashier v. Connolly 113 U. S. 27-31; Ex parte Virginia 100 U. S. 339, page 347; Ritchie v. People 155 Ill., 98-100; Eden v. People 161 Ill. 296-318; Plessy v. Ferguson, 163 U. S. 537; Clarke v. Maryland Institute 87 Md. 643.

N. B. HAYS, Attorney General. for appellee. CHARLES H. MORRIS of counsel.

## POINTS AND AUTHORITIES.

1. The principal question presented on this appeal is whether or not this statute is a valid and reasonable exercise of the police power inherent in every sovereign government and State.

2. Individual liberty of action or right must give away to the greater right of the collective people in the assertion of a well defined policy, designed and intended for the general welfare. Cooley's Const. Lim., 6th Ed., 704; New Orleans Gas and Light Co. v. Hart, 40 La. 474; Lake View v. Rose Hill Cemetery Co., 70 Ill. 192; Tiedeman's Limitations of Police Powers, page 212; 1 Hares American Constitutional Law, 766; 111 U. S., 746, Justice Bradley; 165 U. S., 580, Justice Peckhan; State v. Holden, 14 Utah, 718; Commonwealth v. Alger, 7 Cush., 85; Powell v. Penn., 127 U. S., 678; 22 A. & E. Enc. Law, 2nd, Vol. 937.

3. Laws prohibiting intermarriage between the two races, in force not only in the Commonwealth of Kentucky, but in many of the States, have been held to be a reasonable and valid exercise of the police power of the State. Ex parte Hobbs, 1 Woods, 537 and 543; State v. Gibson, 36 Ind., 402 and 405; State v. Jackson, 80 Mo., 177; State v. Harston, 63 N. C., 453; Brook v. Brook, 9 H. L., 193; Green v. State, 29 Am. Rep., 742; Trasher v. State, 3 Tex. App., 263; Doc Lonas v. State, 3 Heisk, 309 and 310.

4. Laws of several States, as well as Kentucky, prohibit the two races from attending the same public school, and providing separate public schools for the two races. These laws have been held to be a reasonable and valid exercise of the police

power of such States, and not to abridge any right or privilege granted by the 14th Amendment to either of the races. Lehew v. Brummell, 103 Mo., 551 and 552; Cary, et al, v. Carter, 48 Ind., 362; Martin v. Board of Education, 42 W. Va., 515; State of Ohio v. McCann, 21 Ohio, 210; Cisco v. School Board, 161 N. Y., 598; Bertonneau v. Board of Directors, 3 Woods, 180.

5. The laws of several States, including Kentucky, require common carriers to provide separate cars or coaches for the white and colored persons who travel over their lines. These laws have been upheld by the Supreme Court of the United States, as a reasonable and valid exercise of the police power. West Chester & Phil. R. R. Co. v. Miles, 93 Am. Dec., 746-8; Smith v. State, 100 Tenn., 494; L. O. & T. R. R. Co. v. State, 133 U. S., 578 (33-784); Plessy v. Ferguson, 163 U. S., 537 (41: 260); C. & O. Railway Co. v. Kentucky, 179 U. S., 392 (45: 247).

6. It is the public policy of the Commonwealth of Kentucky to preserve the identity of each race; maintain the purity of its blood; to prevent an amalgamation, and as a mean to this end, the statute in question was adopted. This will be seen from the following constitutional and statutory provisions. Constitution, Sec. 187; Kentucky Statutes, Sec. 4428; Kentucky Statutes, Sec. 2111; Kentucky Statutes, Sec. 2114; Kentucky Statutes, Sec. 2097; Kentucky Statutes, Sec. 2098; Kentucky Statutes, Sec. 795; Constitution, Sec. 51.

7. The title is "An Act to prevent white and colored persons from attending the same school." The word "same" used in the title of said act, must, under section 460 of the Kentucky Statutes, be construed as understood by its approved usage, as indicated above. Constitution Sec. 51; Gayle v. Owen County Court, 83 Ky., 61; Burnside v. Lincoln County Court, 86 Ky., 423; Cooley's Const. Lim., 7th Ed., page 209-211; 23 A. & E. Enc. of Law, 1st Ed., 225; 55 L. R. A., 740; 56 L. R. A., 658; 56 L. R. A., 757; 56 L. R. A., 570; 7 L. R. A., 99; 10 L. R. A., 196; 40 L. R. A., 195; 57 L. R. A., 63; 53 L. R. A., 763; 56 L. R. A., 893; 55 L. R. A., 740.

8. These declarations of rights are subject to police regulation. That attribute of sovereignty in every State so essential to protect the welfare of the community requires that these rights be held subject to its police regulations. Hare's American Constitutional Law, 766.

9. This act neither denies the equal protection of the law, nor does it deprive any person of life, liberty or property without due process of law. Social equality is not guaranteed by the 14th Amendment, nor is voluntary association guaranteed to the races.

Cary v. Carter, 17 Am. Rep., 757 Cooley's Const. Lim., 7th Ed., 830; Powers v. Commonwealth, 90 Ky., 169; Robinson v. Commonwealth, 101 Ky., 287; Dunn v. Commonwealth, 88 Am. Rep., 344 (Ky.). N. Y., N. H. & H. R. R. Co., v. New York, 165 U. S., 628 (41: 854); Gladdein v. Minnesota, 166 U. S., 427 (41: 1065); Allgeyer v. Louisana, 165 U. S., 578 (41: 833); Northern Sec. Co. v. U. S., 193 U. S., 196 (48: 679); Otis v. Parker, 187 U. S., 606 (47: 323); Holden v. Hardy, 169 U. S., 366 (42: 780).

OPINION OF THE COURT BY JUDGE O'REAR.

There were two indictments against appellant in the Madison circuit court, for alleged infractions of an act of the legislature, approved March 22, 1904, entitled "An act to prohibit white and colored persons from attending the same school." The first indictment, which was numbered 6,009 on the circuit court calendar, charged appellant with operating a school for whites and negroes in violation of the act. The second indictment, numbered 6,045, charges appellant with the offense of "maintaining and operating a college, school, and institution of learning where persons of the white and negro races are both received, and within a distance of twenty-five miles of each other, as pupils for instruction." The act alluded to, the title to which has been given above, is in the following words:

"Section 1. That it shall be unlawful for any person, corporation or association of persons to maintain or operate any college, school or institution where persons of the white and negro races are both received as pupils for instruction; and any person or corporation who shall operate or maintain any such college, school or institution shall be find $1000, and any person or corporation who may be convicted of violating the provisions of this act shall be fined $100 for each day they may operate said school, college or institution after such conviction.

"Sec. 2. That any instructor who shall teach in any school, college or institution where members of

said two races are received as pupils for instruction, shall be guilty of operating and maintaining same, and fined as provided in the first section hereof.

"Sec. 3. It shall be unlawful for any white person to attend any school or institution where negroes are received as pupils or receive instruction, and it shall be unlawful for any negro or colored person to attend any school or institution where white persons are received as pupils or receive instruction. Any person so offending shall be fined $50 for each day he attends such institution or school; Provided, that the provisions of this law shall not apply to any penal institution or house of reform.

"Sec. 4. Nothing in this act shall be construed to prevent any private school, college or institution of learning from maintaining a separate and distinct branch thereof, in a different locality, not less than twenty-five miles distant, for the education exclusively of one race or color.

"Sec. 5. This act shall not take effect, or be in operation, before the 15th day of July, 1904."

Acts 1904, p. 181, c. 85.

Appellant was found guilty, and fined $1,000 in each case. These appeals involve the constitutionality of the statute. The cases are heard and disposed of together. Appellant Berea College is a private non-sectarian school. It was founded some 50 years ago, for the purpose, it is said, of "promoting the cause of Christ," and to give general and non-sectarian religious instruction to "all youth of good moral character." With a large endowment, extensive buildings and grounds and educational paraphernalia, it had for nearly 50 years before the act in question maintained a school at Berea, in Madison county, this State, presumably upon substantially the same basis as it was doing when the statute was enacted, and the indictments in these cases returned. The circuit court sustained the constitutionality of the act in every particu-

lar. Appellant assails its constitutionality upon the ground that it violates the Bill of Rights embraced in the Constitution of this State, as well as that it is in conflict with the Fourteenth Amendment to the Constitution of the United States.

It is claimed that the act is repungnant to the Bill of Rights, in that it violates the following, which are guaranties to every citizen: (1) The right of enjoying and defending their liberty. (2) The right of worshiping Almighty God according to the dictates of their own consciences. (3) The right of seeking and pursuing their safety and happiness. (4) The right of freely communicating their thoughts and opinions. (5) The right of acquiring and protecting property. (6) That every person may freely and fully speak, write and print on any subject, being responsible for the abuse of that liberty.

The twenty-sixth section of the Bill of Rights concludes: "To guard against transgression of the high powers which we have delegated, we declare that everything in this Bill of Rights is excepted out of the general powers of government, and shall forever remain inviolate; and all laws contrary thereto, or contrary to this constitution, shall be void:"

Appellant's contention is: "This act violates the letter or spirit of every one of the provisions referred to. It destroys the rights of the teachers and pupils of Berea College to enjoy their liberties and the right of seeking and pursuing their safety and happiness. It denies the right to worship God according to the dictates of their own consciences by attending and participating in non-sectarian religious exercises in a school or institution of their own choice. It denies to the trustees, the teachers, and all others connected with the institution, the right to freely communicate their thoughts and opinions, and it denies to the institution itself and to its assistants and employes of every grade the right of acquiring and protecting

property, and the right to follow their usual and innocent occupations.''

We understand appellant's argument to reach to the conclusion that the exercise of police power by the State is prohibited concerning the subjects enumerated in the Bill of Rights; at least it is beneath those rights, and must be exercised so as not to conflict with them. No jurist has dared to attempt to state the limit in law of that quality in government which is exercised through what is termed the ''police power.'' All agree that it would be inadvisable to attempt it. Yet very broadly and indefinitely speaking, it is the power and obligation of government to secure and promote the general welfare, comfort, and convenience of the citizens, as well as the public peace, the public health, the public morals, and the public safety. Cooley's Const. Limitations, 704; Tiedeman's Limitations of Police Power, 212; 1 Hare's American Constitutional Law, 766. It is not inaptly regarded in some of its most important features as the right of self-protection in government, the right of self-preservation in society. It inheres in every state, is fundamental in the existence of every independent government, enabling it to conserve the well-being of society, and prohibit all things hurtful to its comfort or inimical to its existence. In view of these definitions of the principle, unsatisfactory as they must be conceded to be, it is apparent that even those things reserved by the people in the Bill of Rights from the powers delegated to their magistrates are impliedly subject also to this power to preserve the State. It has always been so regarded, except wherein its exercise in a particular manner or of a particular thing is expressly excluded, or necessarily so by the language used. It would be more tedious than difficult to enumerate instances. But some of those most readily occurring to the mind which are held subject to this power are, that life and liberty either or both,

may be forfeited by the citizen under laws enacted under it.  The right of worshiping Almighty God according to the dictates of our own consciences —probably the first great moving cause of our early colonial civilization—yields to the proper exercise of this power.  For example, the practices of polygamy, so inimical to the well-being of society, though deemed a religious rite, must yield to the police power of the State.  If it were held here by some, as it is in some countries, a religious duty that mothers should worship God by sacrificing their babes, throwing them into the rivers to appease His supposed wrath, it would not be tolerated by the State, however conscientious the votary of the right.  The pursuit of happiness in any useful and innocent employment, or the free movement of one's person, even when done under considerations of his own safety, are subject to this same power.  The most familiar instance, probably, is the application of quarantine and health laws. Yet this power itself fortunately has its limitations. To be exercised exclusively within the discretion of the political branch of government, it must have a just and real relation to one of the ends for which that power may be lawfully employed. Mere declaration that the proposed exercise is in behalf of such end is not enough.  The action must be cognate to one of the subjects to which the power properly pertains. The duty is upon the courts upon a proper application, to declare void an attempted exercise of such power, which is not fairly and reasonably related to a proper end.  Thus balanced, there is little danger that oppression can result from its arbitrary employment. The good sense and the honest judgment of each generation must after all furnish the real limit to the police power of government.  For each age must judge—and will judge—of what is hurtful to its welfare, of what endangers the existence of society, of what threatens to destroy the race of people who are

applying this primal law of self-protection to their own case.

Because of the undefined extent, of its overpowering quality, of its unmeasurable value, of the great danger of oppression under its guise, and of its abuse by those intolerant of the restraints of law, any new application of the police power of government is regarded with closest scrutiny, not unmixed with apprehension. It can be abused, to the hurt of the people.   It can be neglected to the hurt of the State. The application of it by the statute above quoted is new. It has never before been so applied so far as we are certainly aware.   The question is, is it a fair exercise of the police power to prohibit the teaching of the white and negro races together?   Is it a fair exercise of the power to restrain the two races from voluntarily associating together in a private school, to acquire a scholastic education? The mingling of the blood of the white and negro races by interbreeding is deemed by the political department of our State government as being hurtful to the welfare of society.    Marriage by members of the one race with those of the other is prohibited by statute. Sections 2097, 2098, 2111, 2114, Ky. St. 1903. It is admitted freely in argument that the subject of marriage is one of the very first importance to society; that it may be regulated by law even as among members of the same race. Inbreeding is known to lower the mental and physical vigor of the offspring.   So incestuous marriages are prohibited.   Others not incestuous, but involving the probable effect upon the vitality of the offspring, are prohibited also, as marriages by idiots.   Still other inhibitions, such as age, and so forth, are imposed, all of which look to the well-being of the future generations.   No one questions the validity of such statutes, enacted as they confessedly are, under the police power of the State.   Upon the same considerations this same power has been exer-

cised to prohibit the intermarriage of the two races. The result of such marriage would be to destroy the purity of blood and identity of each. It would detract from whatever characteristic force pertained to either. Such statutes have been upheld in the foregoing cases: Ex parte Hobbs, 1 Woods (U.S.) 537, Fed. Cas. No. 6,550; State v. Gibson, 36 Ind. 402, 10 Am. Rep. 42; State v. Jackson, 80 Mo. 177, 50 Am. Rep. 499; State v. Hairston, 63 N. C. 453; Brook v. Brook, 9 H. L. 193; Green v. State, 58 Ala. 190, 29 Am. Rep. 742; Lonas v. State, 3 Heisk. (Tenn.) 309. Another exercise of the police power with respect to the separation of the two races, which has been upheld, is the requiring them to use separate coaches in traveling upon railroads, as adopted by certain of the States. These statutes and regulations of a similar kind, even without statute, have been upheld wherever their validity has been questioned. The opinions in the following cases show the unanimity of holding and reasoning on this subject: West Chester & Phil. R. R. Co. v. Miles, 55 Pa. 209, 93 Am. Dec. 747; Smith v. State, 100 Ten. 494, 46 S. W. 566, 41 L. R. A. 432; L. N. O. & T. R. R. Co. v. Mississippi, 133 U. S. 587, 10 Sup. Ct. 348, 33 L. Ed. 784; Plessy v. Ferguson, 163 U. S. 537, 16 Sup. Ct. 1138, 41 L. Ed. 256; C. & O. Ry. Co. v. Kentucky, 179 U. S. 392, 21 Sup. Ct. 101, 45 L. Ed. 244. We have such statute in Kentucky. Section 795, Ky. St. 1903. The validity of this statute has been upheld by this court in L. & N. R. R. Co. v. Commonwealth, 99 Ky. 663, 18 Ky. L. R. 491, 37 S. W. 79; Quinn v. L. & N. R. R. Co., 98 Ky. 231, 17 Ky. L. R. 811, 32 S W. 742; Wood v. L. & N. R. R. Co. 42 S. W. 349, 19 Ky. Law Rep. 924; Id., 101 Ky. 703, 19 Ky. L. R. 924, 42 S. W. 349; Ohio Valley R. R. Co. v. Lander, 104 Ky. 431, 20 Ky. L. R. 913, 47 S. W. 344, 882; C. & O. Ry. Co. v. Commonwealth, 51 S. W. 160, 21 Ky. Law Rep. 228.

In the provisions for public education made by the

government of the United States for the District of
Columbia, and by many of the states, a separation of
the races is enforced by requiring separate schools
to be provided for each, and prohibiting members of
either race from attending the school provided for the
other. In every instance in which the question has
arisen as to the validity of such legislation, it has been
upheld as a valid exercise of its police power by the
State. Sections 16 and 17, c. 156, 13 U. S. Stat. 191;
Section 187, Const. Ky.; section 4428, Ky. St. 1903;
Lehew v. Brummell, 103 Mo. 551, 15 S. W. 765, 11 L.
R. A. 828, 23 Am. St. Rep. 895; Cory v. Carter, 48 Ind.
362, 17 Am. Rep. 738; Martin v. Board of Education,
42 W. Va. 515, 26 S. E. 348; State of Ohio v. McCann.
21 Ohio St. 210; Cisco v. School Board, 161 N. Y. 598,
56 N. E. 81, 48 L. R. A. 113; Bertonneau v. Board of
Directors, 3 Woods (U. S.) 180, Fed. Cas. No. 1,361.

Distinguished counsel for appellant, while conced-
ing the correctness of the application of the principle
being discussed to public schools and common car-
riers, seek to distinguish that application from the
one contended for by the State in the case at bar up-
on the ground that in the cases of common schools and
railroad travel the State was merely preventing an en-
forced association by the two races; whereas under
the statute now being considered the power is at-
tempted to be extended so as to prevent the voluntary
association by the two races. We cannot agree that
the ground of distinction noted could form a proper
demarkation between the point where the power might
be exercised, and the one where it might not be.
The thing aimed at by all this legislation was
not that of volition. It was not until recently that
attendance upon common or public schools was com-
pulsory. It has nearly always been voluntary. All
this legislation was aimed at something deeper and
more important than the matter of choice. Indeed, if
the mere choice of the person to be affected were the

only object of the statutes, it might well be doubted whether that was at all a permissible subject for the exercise of the police power. The separation of the human family into races, distinguished no less by color than by temperament and other qualities, is as certain as anything in nature. Those of us who believe that all of this was divinely ordered have no doubt that there was wisdom in the provision; albeit we are unable to say with assurance why it is so. Those who see in it only nature's work must also concede that in this order, as in all others in nature, there is an unerring justification. There exists in each race a homogenesis by which it will perpetually reproduce itself, if unadulterated. Its instinct is gregarious. As a check there is another, an antipathy to other races, which some call race prejudice. This is nature's guard to prevent amalgamation of the races. A disregard of this antipathy to the point of mating between the races is unnatural, and begets a resentment in the normal mind. It is incompatible to the continued being of the races, and is repugnant to their instincts. So such mating is universally regarded with disfavor. In the lower animals this quality may be more effective in the preservation of distinct breeds. But among men conventional decrees in the form of governmental prescripts are resorted to in aid of right conduct to preserve the purity of blood. No higher welfare of society can be thought of than the preservation of the best qualities of manhood of all its races. If then it is a legitimate exercise of the police power of government to prevent the mixing of the races in cross-breeding, it would seem to be equally within the same power to regulate that character of association which tends to a breach of the main desideratum—the purity of racial blood. In less civilized society the stronger would probably annihilate the weaker race. Humane civilization is endeavoring to fulfill nature's edicts as to the preservation

of race identity in a different way. Instead of one exterminating the other, it is attempted to so regulate their necessary intercourse as to preserve each in its integrity.

The maxims of liberty and the pursuit of happiness which are familiar to the common law, wherefrom the idea found in our Bill of Rights is probably borrowed, are the principles worked out by the Anglo-Saxon race for its own government. In no other country has it ever been attempted before, at least on so important a scale, to apply such principles alike to so many different races, types, and creeds of men. The experiment is great in its importance. It forms now one of the biggest questions being worked out by this great North American republic. That much bitterness has appeared, and some oppression has been practiced, are among the inevitable attendants upon the adjustment by people of different races of the rights justly belonging to each. Clashing of antipathies resulting in outbreaks of violence tends to disturb the public peace; threatens the public safety, and so disrupts the serenity of common purpose to promote the welfare of all the people, that the question is become one of the first importance to the section where the two races live in the greatest numbers. That it is well within the police power of government to legislate upon this question so far as to repress such outbreaks and to prevent disturbances of the public tranquility, we have no sort of doubt. The seriousness of the situation is not new. Even before the abolition of slavery it was keenly and intelligently anticipated. Since the emancipation of the negro it has not been the least of the grave problems of government which have been presented to some of the States for solution. As the outcome of discussion, of agitation, of too frequent conflicts, of violent turbulence that set even the law at defiance in some localities and in times of great popular excitement, this species of legislation has

been evolved as tending to a solution of the trouble by removing as far as possible its cause. Is not this situation one, if ever there was one, which calls for and amply justifies the exercise of police power of the government? Or should this irritating cause be left without restraint or control, till by the exhaustion of one side or the other it is settled by the sheer force of superiority of numbers or physicial power? It is idle to talk of controlling ideas by legislation, or even by force. You cannot bind an idea by a statute. The attempt should be made, and we believe is being made in good faith to so control this situation through the law that neither race can have just cause for complaint; so that each may have every lawful privilege and right that the other has; so that equality of rights before the law shall be a fact, as well as a high-sounding theory; yet so as to conserve the very best of the characteristics of each race, to develop its idea of morality, its thrift, independence and usefulness. Observation and study at close hand of both the theory and practical working of this problem of social existence, of the collaboration of two races so different as the white and black in the same State upon a plane of legal equality, where the government is by the people for the people, it has been found, so the legislative department declares, as evinced by the public policy indicated by the statutes discussed in this opinion, that at the very bottom of all the trouble is the racial antipathy to the destruction of its own identity; and, that, if that danger is removed, the friction practically disappears. A separation of the races under certain conditions is therefore enforced, where it is believed that their mingling would tend to produce the very conditions which is found, it lies at the base of the trouble. In its application it becomes all the more necessary that the overmastering principles included in the police power of the government be firmly recog-

nized, so that a clashing of race prejudices, or race destruction, may be lawfully averted.

Counsel resort to conjecture concerning other legislation of this character which they fear might follow that now involved. It is suggested that the State might attempt to regulate, under the same power, the right of the races to work together in the same fields or factories, or to mingle together at all. A sufficient present answer to this is that each proposed application of the power is to be determined upon the circumstances under which it is sought to be applied. If it is arbitrary, unreasonable, or oppressive, it will be denied. Nor is it a legitimate argument to prove a negation of power by showing wherein it may be abused. If it be conceded, as we think the fact is, that the ultimate object of this legislation providing separate schools for the two races was to separate the youth of each during the most impressible and least responsible period of their lives and until ripened judgment and observation can have set them well in the safe ways of thinking, much of the dangers of the shame and distress which errors of immaturity might entail would be avoided. The legislation above enumerated is all of a kind. It has two great objects. One, the preservation of the identity and purity of the races; the other, the avoidance of clashes between the races by preventing their most fruitful sources.

In upholding this character of legislation in a separate coach regulation the Supreme Court of Pennsylvania, in West Chester etc., R. R. Co. v. Miles, 93 Am. Dec. 747, thus stated the principal thought: "The danger to the peace engendered by the feeling of aversion between individuals of the different races cannot be denied. It is the fact with which the company must deal. If a negro takes his seat beside a white man or his wife or daughter, the law cannot repress the anger or conquer the feeling of aversion

which some will feel. However unwise it may be to indulge the feeling, human infirmity is not always proof against it. It is much wiser to avert the consequences of this repulsion of race by separation, than to punish afterwards the breach of the peace it may have caused. * * * The right to separate being clear in proper cases, and it being the subject of sound regulations, the question remaining to be considered is whether there is such a difference between the white and black races within this State, resulting from nature, law, and custom, as makes it a reasonable ground of separation. The question is one of difference, not of superiority, or inferiority. Why the Creator made one black and the other white, we know not; but the fact is apparent, and the races distinct, each producing its own kind, and following the peculiar law of its constitution. Conceding equality, with natures as perfect and rights as sacred, yet God has made them dissimilar, with those natural instincts and feeling which He always imparts to his creatures when He intends that they shall not overstep the natural boundaries he has assigned to them. The natural law which forbids their intermarriage, and that social amalgamation which leads to a corruption of the races, is as clearly divine as that which imparted to them different natures. The tendency of intimate social intermixture is to amalgamation, contrary to the law of races. The separation of the white and black races upon the surface of the globe is a fact equally apparent. Why this is so, it is not necessary to speculate; but the fact of a distribution of men by race and color is as visible in the providential arrangement of the earth as that of heat and cold. The natural separation of the races is therefore an undeniable fact, and all social organizations which lead to their amalgamation are repugnant to the law of nature. From social amalgamation it is but a step to illicit intercourse, and but another to in-

termarriage. But to assert separateness is not to declare inferiority in either; it is not to declare one a slave and the other a freeman—that would be to draw the illogical sequence of inferiority from difference only. It is simply to say that following the order of Divine Providence, human authority ought not to compel these widely separate races to intermix. The right of such to be free from social contact is as clear as to be free from intermarriage. The former may be less repulsive as a condition, but not less entitled to protection as a right. When, therefore, we declare a right to maintain separate relations, so far as is reasonably practicable, but in a spirit of kindness and charity, and with due regard to equality of rights, it is not prejudice, nor caste, nor injustice of any kind, but simply to suffer men to follow the law of races established by the Creator himself, and not to compel them to intermix contrary to their instincts." Appellant's counsel construe this opinion as supporting their theory that the power being discussed may be exercised only where it forbids the enforced association of the races. While such enforced association is more easily distinguished as falling within the power, yet the main idea is that such association at all, under certain conditions, leads to the main evil, which is amalgamation of the races, and incidentally to conflicts between their members naturally engendered by too close personal contact under conditions which are bound to excite prejudices and race animosities. If such evil falls within the police power to prevent, then whatever naturally contributes to them may also be regulated, provided the regulation is itself reasonable. The act in question is within the legitimate exercise of the police power of the State, provided it is not so unreasonable in its provisions as to be oppressive and obnoxious to the limitations of the power.

It is  argued for  appellant  that  the  act , quoted
makes  it  a  misdemeanor  to  teach  white  and  negro
pupils  in  the  same  institution  anywhere  in  the
State  (but  for  the  proviso  contained  in  the  fourth
section  of  the  act),  although  there  might not be
a mingling  of  the  races at  all.   This  would  be  out
of  harmony  with  the  spirit  of  the  law.   It  would
be  an  unreasonable  and  unwarranted  interference,
indeed,  with the  citizens'  right to  teach,  and  the
pupils, to be taught.   Under the rule for the construc-
tion  of  a  statute  to  resolve  any  ambiguity  in  its  lan-
guage  in  favor  of  that  meaning  which  is  not  repug-
nant  to  the  Constitution,  if  the  language  admits  of
more  than  one  construction,  we  have  no  doubt  that
the  intention  of  this  act  was  to  prevent  the  two  races
from  attending  the  same  school  at  the  same  place  and
the  same  time,  whereby  there  would  result  an  inter-
mingling,  or  close  personal  association  between  them.
Such  is  the  fair,  reasonable  meaning  of  the  whole  act,
including  title  and  context.   Section  4  of  the  statute
makes  it  a  misdemeanor  not  only  to  teach  pupils  of
the  two  races  in  branches  of  the  same  institution,  even
though  one  race  exclusively  is  taught  in  one  branch,
and  the  other  in  another  branch,  provided  the  two
branches  are  within  25  miles  of  each  other.  This  sec-
tion  is  added  as  a  proviso  to  the  previous  sections.
Without this section as we construe the act, the teach-
ing  of  the  two  races  in  the  same  school  at  the  same
time  and  place  is  prohibited.   But,  if  the  same  school
taught  the  different  races  at  different  times  though
at  the  same  place,  or  at  different  places  at  the
same  time,  it  would  not  be  unlawful.  It  evidently  was
thought  that  the  effect  of  the  statute  might  be  nul-
lified  by  teaching  the  two  races  in  the  same  school  at
the  same  time  and  place  in  fact,  but  perhaps  in  dif-
ferent  rooms  of  the  same  building,  or  in  different
buildings  of  the  same  college  plant,  constituting  to
all  intents  one  building.   A  teaching  in  different

rooms of the same building, or in different buildings so near to each other as to be practically one, would violate the statute, as it was such intimate personal association of the pupils that was being prohibited. It was attempted by the fourth section to make this impossible, by prohibiting such teaching in branches of the same school if done within 25 miles of each other. This last section we think violates the limitations upon the police power. It is unreasonable and oppressive. We must look to the object of the legislation as well as to the words of the statute to divine the true meaning. It is not to prevent either race from being taught by an institution which also teaches the other. Nor is it to prevent persons of one race from teaching persons of the other, or employing their means for that purpose. The State itself teaches both races, but in separate schools. They are both taught within 25 miles of each other, and within very short distances of each other. But this section can be ignored and the remainder of the act is complete notwithstanding. The remaining question is whether the act as construed by this court violates the Fourteenth Amendment to the Constitution of the United States. That amendment guarantees the equal protection of the laws to all citizens of the United States, and prohibits any State from depriving any citizen of the United States of his property, life, or liberty without due process of law. The act involved applies equally to all citizens. It makes no discrimination against those of either race. The right to teach white and negro children in a private school at the same time and place is not a property right. Besides, appellant, as a corporation created by this State, has no natural right to teach at all. Its right to teach is such as the State sees fit to give to it. The State may withhold it altogether, or qualify it. Allgeyer v. Louisiana, 165 U. S. 578, 17 Sup. Ct. 427, 41 L. Ed. 832. We do

not think the act is in conflict with the Federal Constitution.

Wherefore, we conclude that the judgment in case 6,009 should be affirmed, and that the judgment in case 6,045 should be reversed, and be remanded with directions to dismiss that indictment.

CANTRILL, J., absent.  BARKER, J., dissents, except in case No. 6,045.